**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael Roybal OAXACA,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Steven Edward DELMAN,**
**Defendant-Appellant.**

**Nos. 77–1995 and 77–2272.**

United States Court of Appeals,
Ninth Circuit.

Feb. 13, 1978.

Rehearing and Rehearing In Banc
Denied May 12, 1978.

**520**

John F. Walter, of Walter, Finestone & Richter, Kirschner & Greenberg, Los Angeles, Cal., for defendants-appellants.

James P. Gray, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before BROWNING and DUNIWAY, Circuit Judges, and EAST,* District Judge.

DUNIWAY, Circuit Judge:

Oaxaca and Delman appeal from judgments convicting them of armed bank robbery, a violation of 18 U.S.C. § 2113(a) and (d). Oaxaca was charged in a one-count indictment alleging a single armed bank robbery. He was convicted after a jury trial. Delman was charged with committing the same bank robbery and four other armed bank robberies as well. He was convicted after a trial to the court on stipulated facts. We affirm both convictions.

## FACTS

On December 21, 1976, at about 2:50 p. m., two men wearing ski masks and carrying guns held up the Crocker National Bank in the City of Commerce, California. The robbers took $2,208 in currency from two tellers at gunpoint and placed the money in a brown paper bag. The serial numbers of six of the stolen bills had previously been recorded.

One of the bank tellers saw the robbers drive off in a green Datsun automobile, noted the license number of the car, and immediately relayed it to the police, along with a general description of the robbers. News of the robbery was promptly broadcast over police radio channels. A license number check revealed that the registered owner of the green Datsun resided at 7408 Bennington Avenue, Pico Rivera, California.

Deputy Sheriffs Eaton and Young were on patrol when they learned of the robbery from the police radio broadcast. They arrived at the Bennington Avenue address within five or six minutes, parked a short distance away in an unmarked patrol car, and watched. A short time later, a man, later identified as Oaxaca, left by the front door, got into a white Chevrolet, and began driving in their direction. When he neared the patrol car Oaxaca looked directly at Deputy Eaton, appeared startled, and stopped his car abruptly. He backed up to the Bennington Avenue residence, parked in the driveway, and ran back inside the house. By this time, a large number of law enforcement officials had converged on the scene. Preparations were being made to enter the house when Oaxaca reemerged and ran toward the white Chevrolet. He was immediately arrested and handcuffed.

---

* The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

At approximately the same moment, a loud noise was heard, coming from either the house or the garage. Three of the officers who were present thought that it came from the garage, which was attached to the house. Believing that someone was hiding inside, they opened the garage and entered it to search for suspects. Inside they saw the green Datsun automobile with the license number that the bank teller had reported to the police. On the floor of the car a revolver and a brown paper bag containing ski masks were plainly visible.

Shortly after the entry into the garage, one of the officers knocked loudly on the front door of the house, announced his identity, and demanded that anyone inside come out. There was no response. The officers then entered the house through the rear door and conducted a thorough search for suspects. Initially, they found no one. Then one of the officers discovered a trap door in a bedroom closet which led down to a crawl space underneath the house. Dust particles were floating in the air beneath the trap door, leading the police to believe that someone had descended into the crawl space only recently. Three of the officers lowered themselves through the trap door and proceeded to search the crawl space for suspects. At the end of the crawl space they found Delman and arrested him. Two of the officers thought that they saw a few loose bills lying partially buried in the soft dirt beneath Delman's knees. They left the money behind while they handcuffed Delman and removed him from the crawl space. One of the officers then returned to the spot where Delman was arrested and found a bundle of currency lying buried in the dirt. Included in the bundle were the six bills with the prerecorded serial numbers.

After Delman's arrest, the police returned to the garage and seized the following items from the green Datsun: (1) two long-sleeved shirts; (2) a long-barrelled revolver; (3) a wallet containing a driver's license and other identification in the name of Steven Delman; and (4) a brown paper bag containing two ski masks, two pairs of surgical gloves and a small automatic weap-on. Tests were later run on the brown paper bag and a latent print of Oaxaca's right index finger was discovered on the bottom.

Police interviewed Delman on the evening of the robbery and again on the following day. During the first interview Delman was asked about the location of the stolen money and said that it was underneath the house. During the second interview Delman confessed to having robbed the Crocker National Bank and four other banks as well.

## I.

### THE SEARCH OF THE GARAGE

Delman argues that the police lacked probable cause to enter and search the garage. Therefore, he says, the various incriminating articles which were seized from the green Datsun should have been suppressed as the fruits of an illegal search.

■ The officers who entered and searched the garage knew that the Crocker Bank had been held up, some fifteen minutes previously and a short distance away, by two robbers who fled in a car which was registered to the Bennington Avenue address. They had seen Oaxaca leave the residence by car and return in haste after spotting an unmarked patrol car parked a short distance away. This information gave them probable cause to believe that the men who robbed the bank had fled to the residence at Bennington Avenue.

The exigencies of hot pursuit justified the warrantless entry into the garage. *United States v. Scott*, 9 Cir., 1975, 520 F.2d 697, 700, *cert. denied*, 1976, 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645. F.B.I. Special Agent Thomas testified that seconds after Oaxaca's arrest he heard a "very loud noise" which "sounded like a heavy object being dropped on the floor or someone jumping from a height onto the floor" which caused him to run for cover. Deputy Sheriffs Smith and Eaton and Detective Sergeants Rodriquez and Stoner testified that they, too, heard the sound which

Thomas described. While Officers Smith and Stoner and Agent Thomas were unable to pinpoint the source of the sound, Officers Rodriquez and Eaton, who were immediately outside the garage, testified that the noise they heard definitely came from within the garage. All of the officers testified that the garage was searched in response to the sound with an eye toward discovering a suspect or suspects believed to be hiding there.

The circumstances closely resembled those which the police confronted in *Warden v. Hayden*, 1967, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782. There the Court upheld a warrantless entry into a dwelling. We uphold the warrantless entry here.

## II.

## THE SEARCH OF THE CRAWL SPACE

■ Delman also challenges the search of the crawl space which resulted in the seizure of the stolen bank money. Delman concedes that exigent circumstances justified the initial entry into the crawl space but maintains that "any hot pursuit evaporated" at the moment of his arrest. Consequently, he says, the warrantless reentry into the crawl space after his arrest and removal cannot be justified.

Sergeant Smith and Special Agent Thomas, the officers who made the initial descent into the crawl space, both testified that they saw money lying in the dirt when Delman was arrested underneath the house. The officers' presence in the crawl space was justified under the doctrine of "hot pursuit" and the money was within their plain view. They could have seized it then and there, had it been practical to do so. Instead, they adopted the prudent course of removing Delman first and retrieving the money afterwards. Delman's argument is premised on the untenable assumption that there were two entirely separate searches, each of them requiring a separate justification. There was really only one search which was interrupted briefly for the very good purpose of removing Delman.

## III.

## ADMISSIBILITY OF DELMAN'S CONFESSION

On the day after the Crocker Bank was robbed, police interviewed Delman at the jail ward of the county hospital. During the interview Delman admitted that he robbed the Crocker Bank and four other banks as well. Delman now argues that his confession should have been suppressed because (1) he was not properly advised of his rights; (2) his request to have an attorney present during the interview was ignored; and (3) he did not voluntarily waive his right to remain silent.

At trial F.B.I. Special Agent Thomas, one of the officers who interviewed Delman at the jail ward of the hospital, testified that he advised Delman of his constitutional rights informally and also read him the rights from a standard form. At a pre-trial suppression hearing Delman acknowledged that he was familiar with the process of police interrogation; that he understood at the time of the hospital interview that anything he said could be used against him; and that Special Agent Thomas did indeed read him a standard form containing the *Miranda* warnings. Delman's contention that the warnings he received were inadequate is thus belied by his own testimony.

At the pre-trial suppression hearing Delman testified that he asked the two officers who interrogated him whether an attorney was "supposed" to be present. Delman admitted that he did not explicitly request an attorney's presence and that he was advised of his right to counsel and understood it. Both of the officers who conducted the interview denied that Delman asked that counsel be present. If there was any conflict between Delman's version of the facts and that of the officers, we must assume that the trial court resolved it in favor of the government's witnesses.

■ Delman says that his confession was involuntary because, at the time of the hospital interview, he was suffering from the combined effects of mild heroin withdrawal and a blow to the head. However, Deputy

Sheriff Wagner testified that during the interview Delman "seemed alert" and gave "fairly specific answers" to the officers' questions. In his opinion Delman "knew where he was at. He knew what he was facing." Dr. Howard Marx, who treated Delman on the day of the hospital interview, testified that at the time of the examination Delman's condition was good. He observed no adverse symptoms aside from some disorientation as to time. The district court's finding that Delman confessed voluntarily is amply supported by the evidence.

## IV.

### SUFFICIENCY OF THE EVIDENCE

■ Oaxaca says that the evidence was insufficient to permit a reasonable jury to find him guilty beyond a reasonable doubt. We summarize the evidence in the light most favorable to the government, as we must on this appeal. *Glasser v. United States*, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; *United States v. Magana*, 9 Cir., 1972, 453 F.2d 414, 415.

Oaxaca was present at 7408 Bennington Avenue in the company of Delman some fifteen minutes after the Crocker Bank was robbed by two armed men. When he was leaving the residence and saw the watching officers, he hastily returned to the residence. The getaway car was found at that address and so was the stolen money. Delman admitted that he was one of the two robbers and no other suspect, aside from Oaxaca and Delman, was found in the course of a thorough search. Delman claimed that he robbed the bank with an individual named "Chuchee" who, he said, escaped through the rear of the residence at approximately the moment of Oaxaca's arrest. However, police who were guarding the rear of the house at the time saw no fleeing suspect. No one answering the description of "Chuchee" was ever found.

A brown paper bag containing ski masks, surgical gloves, and a gun was found in the getaway car and Oaxaca's fingerprint was on the bottom of it. The pants, belt and shoes which Oaxaca was wearing at the time of his arrest resembled very closely those worn by one of the robbers as shown in bank surveillance photographs taken during the course of the holdup. Of four strands of hair which were retrieved from one of the ski masks, three closely resembled Oaxaca's hair.

The foregoing evidence was sufficient to permit the jury to conclude beyond a reasonable doubt that Oaxaca acted as Delman's accomplice in the robbery of the Crocker Bank.

## V.

### SEIZURE OF OAXACA'S PANTS AND BELT

Oaxaca objects to the admission into evidence of his pants and belt. These articles of clothing, which were taken from Oaxaca when he was booked into the Los Angeles County Jail, were later removed from the jail property room without any sort of official process and introduced at trial. Oaxaca says that a warrant was required.

■ The initial seizure of the pants and belt was incident to a lawful arrest and therefore proper. *United States v. Edwards*, 1974, 415 U.S. 800, 802–03, 94 S.Ct. 1234, 39 L.Ed.2d 771. Once the pants and belt were properly in the custody of the Los Angeles County Sheriff's Office, the clothing could be removed or transferred without benefit of official process. *Westover v. United States*, 9 Cir., 1968, 394 F.2d 164, 165; *Evalt v. United States*, 9 Cir., 1967, 382 F.2d 424, 427; *United States v. Caruso*, 2 Cir., 1966, 358 F.2d 184, 185, *cert. denied*, 1966, 385 U.S. 862, 87 S.Ct. 116, 17 L.Ed.2d 88.

## VI.

### SEIZURE OF APPELLANTS' SHOES

Oaxaca and Delman both challenge the warrantless seizure of their shoes. Oaxaca's shoes were seized from his person some six weeks after his arrest while he was still in custody at the County Jail. They were introduced at trial over his objection. Del-

man's shoes, which were the subject of an unsuccessful suppression motion, were seized in the same manner.

Both appellants cite *United States v. Edwards, supra,* for the proposition that the warrantless seizure of the shoes was violative of the Fourth Amendment. In *Edwards,* however, the Court expressly approved the warrantless seizure of a jailed suspect's clothing some ten hours after his arrest and incarceration, noting:

> This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of detention. . . . Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest.

415 U.S. at 805–06, 94 S.Ct. at 1238.

■ While it is true that the time interval between the arrest and seizure in this case exceeded that which was involved in *Edwards,* we attribute no great significance to the delay. *See Cooper v. California,* 1967, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730. Both the defendants and their shoes remained in lawful custody until the time when the shoes were taken for use as evidence. To require a warrant under these circumstances would be to require a useless and meaningless formality.

## VII.

### COMPARISON PHOTOGRAPHS

At trial the prosecution introduced into evidence several black-and-white bank surveillance photographs which depicted the robbery in progress. The photographs show two men wearing ski masks, one markedly taller than the other, both wielding handguns and striding through the bank. The shorter man, whom the government sought to identify at trial as Oaxaca, is attired in light, solid color slacks, brown shoes, and a long-sleeved checkered shirt. The prosecution also introduced some comparison photographs of an F.B.I. agent attired in the pants, belt and shoes that Oaxaca was wearing at the time of his arrest, and in the long-sleeved checkered shirt which was found in the getaway car at the Bennington Avenue residence. Oaxaca says that the comparison photographs should have been excluded because they were irrelevant and prejudicial. He also says that the photographs were hearsay, and that the government failed to authenticate them properly.

■ The issue of whether the clothing worn by Oaxaca at the time of his arrest was the same clothing as that worn by the shorter robber in the bank surveillance photographs was a key issue in the case. The challenged photographs were clearly relevant to that issue. By showing the jury how Oaxaca's clothing photographed in black and white, the pictures facilitated a direct comparison of Oaxaca's known clothing to that displayed in the bank surveillance photographs.

Oaxaca makes much of the fact that the agent in the challenged photographs is dressed in the checkered shirt which was not found on Oaxaca but rather in the green Datsun automobile. This shirt, he says, was never "tied to him in any fashion" and consequently the photographs must be said to "depict irrelevant material." We do not agree that the shirt was irrelevant simply because Oaxaca was not wearing it at the moment of his arrest. The shirt was found in the getaway car at the Bennington Avenue address a short time after the robbery took place. The government contended, and the bank surveillance photograph shows, that it was the shirt which the shorter robber wore during the holdup. The challenged comparison photographs enabled the jury to compare the shirt which was found with the one which was photographed in the bank. The photographs were relevant to the issue of whether the shirts were one and the same shirt.

Oaxaca says that the comparison photographs were more prejudicial than probative because they created the false impression that all of the clothing worn by the

agent in the pictures was Oaxaca's clothing. He maintains that it was insufficiently clear from the photographs that the checkered shirt was linked to him only circumstantially whereas the other articles of clothing were admittedly his. We do not think that the jurors were incapable of drawing the distinction between the shirt and the other articles of clothing which Oaxaca says they should have drawn. It was abundantly clear from the testimony of the officers who searched the green Datsun that the checkered shirt was discovered in the car and not on Oaxaca's person. The F.B.I. agent through whom the photographs were introduced testified that "[t]he clothes were obtained from Mr. Oaxaca and Mr. Delman, and the shirt was obtained from the car."

■ Oaxaca's argument that the comparison photographs were not properly authenticated merits little discussion. F.B.I. Agent Monka testified that he was present when the photographs were taken; that the photographs depicted another agent dressed in Oaxaca's clothes plus the shirt retrieved from the getaway car; and that no unusual form of lighting was used in taking the photographs. While Monka did not explicitly state that the photographs depicted the various articles of clothing accurately, that conclusion was implicit in his testimony. We think that the agent's testimony satisfied F.R.Ev. 901(a)'s requirement of foundation evidence "sufficient to support a finding that the matter in question is what its proponent claims." *See United States v. Hobbs*, 6 Cir., 1968, 403 F.2d 977, 978–79.

■ Finally, Oaxaca argues that the comparison photographs were inadmissible hearsay. They were not hearsay. In order to constitute hearsay, evidence must be assertive or testimonial in character and must be introduced to prove the truth of the matter asserted. F.R.Ev. 801. A jury could have inferred, based on the comparison photographs, that the clothing depicted was the same as that shown in the bank surveillance photographs. The availability of that inference does not make the photographs assertions, however. If every piece

of tangible evidence which was capable of supporting an inference could be said, on that basis, to be an assertion, it is difficult to imagine any piece of evidence that would not be an assertion.

## VIII.

## ADMISSIBILITY OF CERTAIN "OPINION" TESTIMONY

At trial Oaxaca presented testimony suggesting that Delman had robbed the Crocker Bank with an individual named "Chuchee." Oaxaca stated that when he arrived at the Bennington Avenue residence, moments after the robbery, Delman and Chuchee were dividing up the proceeds of a recent "sting." He also stated that Chuchee was still with Delman when he, Oaxaca, left the house for the second time and was arrested in the front yard. Delman corroborated Oaxaca's story, testifying that he robbed the Crocker Bank, not with Oaxaca, but with Chuchee. According to Delman's story, Chuchee escaped through the rear door of the house at precisely the moment when Oaxaca left through the front.

The prosecution introduced certain rebuttal evidence in an attempt to prove that Chuchee did not, in fact, exist. Sergeant Maestas of the Los Angeles Sheriff's Department testified that when he arrived at the Bennington Avenue address, shortly before Oaxaca's arrest, he first drove around the block and checked the back yard of an adjoining residence for suspects. After questioning the occupants of the neighboring house briefly, Maestas testified that he took up a position within sight of the rear door of the Bennington Avenue house. The prosecutor asked Sergeant Maestas whether, in his opinion, he would have seen anyone who had attempted to leave through the back door. Over defense objection, Maestas answered that he thought he would have spotted any suspect who had endeavored to flee through the rear.

On appeal, Oaxaca notes that during the several minutes when Maestas was driving around the block and interviewing the occupants of the adjoining house, Chuchee could

conceivably have escaped. Therefore, he argues, Maestas' statement that he would have spotted a fleeing suspect was not "rationally based on [his] perception" as F.R.Ev. 701 requires.

■ We disagree. Maestas admitted on direct examination that he expended several minutes in searching the yard of the adjoining house and interviewing its occupants. On cross-examination, Maestas conceded that he was not able to see into the yard of the Bennington Avenue residence until he had scaled a five-foot fence which surrounded it. It was thus apparent, from the witness' own testimony, that he was not in a position to observe the rear of the house at all times when "Chuchee" might have escaped. When Maestas testified that he believed he would have seen a fleeing suspect, he was obviously referring to the period during which he actually had the rear of the house in view. The limits of the witness' capacity to observe were thus apparent to the jury. We therefore conclude that Maestas' testimony was rationally based on his perception as F.R.Ev. 701 requires.

## IX.

### HAIR IDENTIFICATION

At trial the prosecution called a criminologist who testified that of four hairs which the F.B.I, retrieved from the red ski mask, three were "similar" to Oaxaca's. Although Oaxaca's counsel failed to object to the criminologist's testimony at trial, he now maintains that its admission into evidence constituted "plain error" within the meaning of F.R.Crim.P. 52(b).

■ Oaxaca makes much of the fact that the criminologist's testimony contradicted the government's theory of the case which was that Oaxaca wore the blue ski mask, rather than the red one, during the bank robbery. However, testimony is not inadmissible simply because it is inconsistent with other evidence in the case. Oaxaca had ample opportunity to establish the inconsistency through cross-examination. To the extent that it did contradict other evidence introduced by the prosecution, the criminologist's testimony worked to Oaxaca's advantage, rather than his detriment, tending, as it did, to undermine the government's theory of the case.

■ Oaxaca complains that the criminologist's testimony was "imprecise," noting that "perhaps two million persons in the United States have hair samples similar" to Oaxaca's. However, the necessarily imprecise character of the hair identification went to the weight of the testimony, rather than its admissibility. The criminologist underwent searching cross-examination, during which he freely conceded that his identification of the three hairs as Oaxaca's was not, and could not be, positive. This was a factor for the jury to consider in determining what weight to give the expert's testimony. The identification was not inadmissible, simply because it was less than certain.

## X.

### ADMISSIBILITY OF PRIOR CONVICTIONS

At trial Oaxaca chose to testify in his own behalf. The prosecutor sought to impeach Oaxaca by introducing evidence that he had suffered two prior felony convictions. The defense attempted to bar any inquiry into the precise nature of the priors but the district judge, refusing to so limit the questioning, permitted the prosecutor to establish that Oaxaca had been convicted of burglary in 1967, and of bank robbery in 1972.

On appeal, Oaxaca acknowledges, as he must, that the district court had "wide discretion in deciding whether to exclude evidence of prior convictions as more prejudicial than probative of lack of credibility." *United States v. Prewitt*, 9 Cir., 1976, 534 F.2d 200, 201. While conceding that the court acted within its discretion in permitting inquiry into his criminal record generally, Oaxaca argues that evidence of the specific nature of his prior convictions was more prejudicial than probative and on this ground ought to have been excluded.

We find no abuse of discretion. The convictions were for crimes which reflected adversely on the defendant's honesty and integrity. As such they were relevant to the question of Oaxaca's credibility, which, in light of his alibi defense, was a key issue in the case.

The 1972 bank robbery conviction was not inadmissible *per se*, merely because the offense involved was identical to that for which Oaxaca was on trial. In *United States v. Wilson*, 9 Cir., 1976, 536 F.2d 883, we held that prior convictions for attempted robbery and receiving stolen property were properly admitted against a defendant charged with bank robbery, in light of their impeachment value. In *United States v. Hatcher*, 9 Cir., 1974, 496 F.2d 529, we concluded that a defendant charged with violating the Dyer Act was properly impeached with evidence of three prior Dyer Act convictions, noting, "[t]he convictions were for theft which is more indicative of credibility than, say, convictions for crimes of violence." 496 F.2d at 530.

## XI.

### ADMISSIBILITY OF OTHER IMPEACHMENT TESTIMONY

Sergeant Wagner of the Los Angeles Sheriff's Department interviewed Delman on two separate occasions following his arrest. The brief initial interview at the Pico Rivera substation was confined to questions concerning the location of the stolen money. At the second interview, conducted at the jail ward of the county hospital, Sergeant Wagner questioned Delman at greater length concerning the bank robbery. Delman asked Wagner at the outset whether he had talked to "Mike," meaning Oaxaca. Delman wanted to know what information, if any, Oaxaca had furnished to the police.

At trial Delman was cross-examined concerning the initial interview at the Pico Rivera substation. When asked whether he had inquired about Oaxaca's fate during this first interview, Delman denied having done so. During the rebuttal phase of its case, the prosecution called Sergeant Wagner and asked him whether, during the *second* interview at the county hospital, Delman had inquired about Oaxaca. Wagner replied that Delman asked about Oaxaca and "wanted to know what Mike had to say." Oaxaca argues that Wagner's response should have been excluded because it was "introduced to contradict Delman's testimony but was not in fact contradictory." Delman, he notes, only denied having asked about Oaxaca during the initial interview.

Oaxaca's argument is premised on the erroneous assumption that Wagner's rebuttal testimony was relevant only to show that Delman's trial testimony was inconsistent with a prior statement. In fact the testimony was also relevant for another purpose. The fact that Delman evinced considerable interest in Oaxaca during the second interview tended to show that Delman's accomplice in the Crocker Bank robbery was actually Oaxaca and not, as Delman claimed, "Chuchee." While Delman's questions concerning Oaxaca could conceivably have been motivated solely by sympathy or curiosity, the jury could have concluded otherwise. Sergeant Wagner's testimony tended to discredit Delman's version of the facts generally and on this basis it was properly admitted.

Affirmed.