**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alan David PASSARO,**
**Defendant-Appellant.**

**No. 79-1354.**

United States Court of Appeals,
Ninth Circuit.

Dec. 13, 1980.

Decided Aug. 4, 1980.

Victor D. Vertner, San Jose, Cal., for defendant-appellant.

Donald B. Ayer, Asst. U.S. Atty., San Jose, Cal., for plaintiff-appellee.

Before CHOY and WALLACE, Circuit Judges, and GRANT,* District Judge.

---

\* Senior District Judge Robert A. Grant of the United States District Court for the Northern District of Indiana, sitting by designation.

GRANT, Senior District Judge:

This is an appeal from a conviction for manufacturing and conspiracy to manufacture a controlled substance.

On June 7, 1978, Defendant Passaro was indicted along with three others, on charges of manufacturing and conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846. On February 9, 1979, Co-defendants Lopez and Prince entered pleas of guilty to Count I of the indictment, charging conspiracy to manufacture, while Co-defendant Stefenel entered a plea to a misdemeanor charge of possession of amphetamine following a plea agreement pursuant to which he agreed to testify at Passaro's trial.

On February 26, 1979, before the commencement of trial, the court heard an *in limine* motion to suppress a photocopy of a document removed from Passaro's wallet after his arrest on March 26, 1978, for assault and battery of police officers who had stopped him for a speeding violation. After denial of the motion, the ten-day trial began and on March 13, 1979, the jury returned a guilty verdict on both counts. During the jury deliberations the court heard argument on and denied defendant's motion for mistrial, alleging prosecutorial comment on defendant's failure to testify. Passaro was sentenced under each count to concurrent sentence of five years' imprisonment followed by a ten-year special parole term.

The prosecution's case can be summarized as follows: First, the Government presented evidence that a complete and operational methamphetamine laboratory was found by agents of the Drug Enforcement Administration (DEA) on March 9, 1978, in an unoccupied house at 140 Figone Lane, Ben Lomond, California. This evidence included a great deal of glassware and mechanical equipment, chemical precursors for manufacture of methamphetamine, and powdered and liquid residues which contained methamphetamine. Among the equipment found was a very large, heavy tableting press, and several sets of punches to be used with it in producing tablets. In addition to the testimony of two agents who participated in the consent search and seizure of the laboratory, the Government offered the expert testimony of a chemist who identified the chemicals that were found there. Finally, the Government offered the testimony of the Director of the San Francisco DEA laboratory, who also participated in the seizure and who gave his expert opinion, based on the evidence presented to that point, that the items found constituted an operational methamphetamine laboratory.

Second, the Government presented evidence concerning another house several miles away from the laboratory, at 12180 Alba Road, Ben Lomond, including a cabin behind the main residence. Through the testimony of the owner and landlord of that house, and of the lead investigative agent, it was shown that some time between September 22, 1977, and March 1, 1978, modifications were made in the cabin which suggested that it was being used for illicit chemical experiments of some sort. A search of the cabin during March 1978 revealed a warped and stained dressing table which had formerly been in good condition, blower vents mounted over the table to remove fumes to the outside, black-out shades on all the windows, an intercom system, and a variety of objects and chemicals consistent with laboratory activities. The landlord testified that none of these objects had been in the cabin when he rented it in September 1977.

Third, by introducing articles found at the laboratory and at the cabin, the Government demonstrated a clear connection between the activities going on at the two places. Found at the Figone Lane laboratory were a newspaper with the mailing sticker address "12180 Alba Road"; empty bottles of the essential precursor P–2–P which had been delivered on December 11, 1977, to the area of 12180 Alba Road; and styrofoam packing material identical to that found in the drawer of the dressing table in the cabin. Found at the Alba Road cabin were a piece of laboratory glassware, instructions for a Marvac vacuum pump of which two were found at the Figone Lane

laboratory, and a quantity of the chemical dimethylamphetamine which had also been found at the laboratory and which the chemist had testified was a rare product of a reaction very similar to that for making methamphetamine.

Fourth and last, the Government presented a wide range of evidence tying Passaro to the illicit laboratory at Figone Lane, to the house and cabin at 12180 Alba Road, and to a conspiracy to manufacture methamphetamine. The testimony of three experts clearly showed that Passaro had left two fingerprints on a piece of glassware found at the laboratory. The testimony of the owner and landlord of the Alba Road house, and of the lessee, Ron Stefenel, established that Passaro resided at 12180 Alba Road throughout the period of October 1, 1977, to March 1, 1978.

Evidence was presented that all of Passaro's co-defendants had purchased laboratory equipment and chemicals during the period in issue, and especially that Lopez and Prince had purchased P–2–P in Arizona and had been followed with that essential precursor, on December 11, 1977, to the immediate vicinity of 12180 Alba Road. Telephone toll records were introduced which showed calls between 12180 Alba Road and the Livermore residence of Lopez and Prince, and one call in particular was made on December 10, 1977, from Arizona to the Alba Road address and charged to the Livermore residence.

A photocopy of a document found on Passaro's person in the course of a custodial arrest was admitted after hearing and over his continuing objection. This document set forth three relationships between specific Milliliter ("ML") and pound and ounce quantities. The forensic chemist testified that these particular relationships were consistent with the yield of methamphetamine from P–2–P which one might reasonably expect from the usual method of production.

The Government also presented the testimony of one Donna Mae Estes, which was admitted only after a lengthy hearing out of the jury's presence and which the witness gave only after an order of compulsion upon a grant of immunity. She testified first that she was presently incarcerated for possession with intent to distribute methamphetamine, and identified a government exhibit as the tablets in her possession when arrested on May 4th or 5th, 1977. Previous testimony by a ballistics expert had indicated unequivocally that the tablets thus identified had been produced by press punches found at the laboratory at 140 Figone Lane.

After stating that she had received the tablets from one Gary Plowman, she related the substance to a meeting between Plowman and Passaro during April 1977, where she observed them go through a catalogue of laboratory glassware and saw Passaro pick out certain items to be purchased. She stated that she, at Plowman's request, later ordered the selected equipment. She testified that she did this knowing full well that the equipment was for use in a methamphetamine laboratory.

In opening statement at final argument, the prosecutor referred to all of the above evidence and made the additional argument that guilt was indicated by the very manner in which defense counsel had tried the case. In so asserting, he specifically argued that defense counsel had contested all aspects of the government's proof, including appellant's residence at 12180 Alba Road and the fingerprint evidence, both of which were established by substantial proof. He argued that this tactic was necessary because defense counsel could not offer any interpretation of the facts as proved which was consistent with innocence.

In his closing argument, defense counsel referred to his client's tactical decision to present no evidence in his own defense and denied that Passaro had lived at 12180 Alba Road.

In that closing argument, the prosecutor referred at some length to the failure of defense counsel in argument to acknowledge the proven facts and present an innocent interpretation of them. On one occasion near the end of this discussion, the prosecutor referred to "the defendant"

rather than to "defense counsel" or "Mr. Vertner", as was otherwise his consistent practice, in asking why it had not been acknowledged that Passaro lived at 12180 Alba Road. We quote from his argument:

And where's the contradictory evidence? You are not barred in this trial, in this deliberation that you're about to undertake, from using your common sense, and you're not barred from asking the question, where is the person—if indeed Passaro was living somewhere else, where are the witnesses who would have seen him? They certainly would have seen him. There would have been a landlord, perhaps, at the house. Where are these people? Why aren't they in court?

Mr. Vertner's made a lot of the fact that the Government has the burden of proof, and indeed it does have the burden of proof. But that burden of proof doesn't mean that you're prohibited from using simple, ordinary, everyday reasoning.

Where are these people? Why aren't they here saying "Alan Passaro was living at No. 5 Elmtree Lane"? Why aren't they here saying that? Because he wasn't, that's why.

And the next question, of course, is—it's a bit redundant, so I'll be quick—why can't the defendant just come out and say "I was living at Alba Road, and the circumstances were A, B, C and D"? Why can't his attorney present this interpretation to you? Because the explanation doesn't exist, that's why.

Defendant presents five allegations of error:

I—That he was denied his Sixth Amendment right to confrontation and cross-examination of witness Stefenel, who exercised his Fifth Amendment right against self-incrimination on certain subjects;

II—That the prosecution improperly referred to personal knowledge of defendant's guilt when, in closing argument, the defendant was characterized as the "kingpin";

III—That the trial court improperly admitted testimony of Witness Estes, which implied that defendant was involved in a controlled substance laboratory at a time preceding the dates suggested in the indictment;

IV—That the trial court erred in denying a motion to suppress a photocopy of a document procured from defendant's wallet during a search conducted after defendant was in custody; and

V—That the prosecutor improperly commented on defendant's failure to testify in his own defense.

The first three allegations of error do not require extensive discussion.

## I — Right to Cross-Examination

■ Defendant's right to cross-examination was not denied. The record reveals that Stefenel was cross-examined at length concerning defendant's residency at the Alba Road house. The Fifth Amendment was asserted only when Stefenel was asked about his involvement with Passaro's co-defendants. We note that the defense neither objected to nor moved to strike Stefenel's testimony, the admission of which was clearly not plain error.

## II — Reference to Defendant as the "Kingpin"

■ The prosecutor's reference to defendant as the "kingpin" and the occasional use of the phrase "we believe", was proper argument based upon reasonable inferences from properly admitted evidence such as proof of purchases of equipment and chemicals by defendant's co-conspirators. No objection to these references was made at trial, and it is clear that the strength of the Government's evidence reduces the likelihood of any prejudicial effect. We do not find any conflict with *Orebo v. United States*, 293 F.2d 747 (9th Cir. 1961), cited by defendant to argue that the prosecutor's remarks require reversal. In *Orebo*, we affirmed a conviction and held, as we do in the case at bar, that the prosecutor's comments were based on evidence properly before the jury.

*III — Testimony of Earlier Criminal Activity*

■ Defendant argues that the Estes testimony constituted evidence of prior criminal acts, inadmissible under Fed.R.Ev. 404(b). The court below expressly ruled that the Estes testimony was direct evidence and did not involve a separate criminal act and, therefore, was not a Rule 404(b) question. We agree with that ruling and find that defendant's reliance on *United States v. Powell*, 587 F.2d 443 (9th Cir. 1978), to be unfounded. *Powell* involved the admissibility of a prior conviction that occurred approximately four years prior to the trial then on appeal, and the Government in that case clearly relied on a Rule 404(b) exception for admission. In the case at bar, the acts testified to by Estes occurred merely several months prior to the time period covered by the indictment, and the district court properly admitted such as direct evidence. This ruling may not be disturbed absent a clear abuse of discretion, *United States v. Butcher*, 557 F.2d 666, 670 (9th Cir. 1977), which defendant has failed to provide.

*IV — Denial of Motion to Suppress*

■ Defendant's allegation of error regarding his motion to suppress the photocopy of the document found in his wallet is a closer question. The evidence establishes that defendant, on March 26, 1978, was lawfully arrested and taken into custody for assault and battery of police officers who had stopped him for a speeding violation. On the day of that arrest, when defendant arrived at the initial place of detention, his wallet was seized from his person, its contents searched, and a document photocopied. It was this copy that was admitted into evidence, the wallet containing the original document having been returned to the defendant.

The question facing this court is whether the above warrantless search falls into one of the exceptions to the Fourth Amendment requirement. Specifically, we face a choice of either applying the warrant requirement under *United States v. Chadwick*, 433 U.S.

1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and its progeny, such as *United States v. Schleis*, 582 F.2d 1166 (8th Cir. 1978), or excepting the search from the warrant requirement under *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) and *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974) and progeny such as *United States v. Oaxaca*, 569 F.2d 518 (9th Cir. 1978). In *Robinson*, the Court held that heroin concealed inside a cigarette package found in defendant's pocket was admissible, even though the package was opened and examined without a warrant, stating:

> A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment but is also a "reasonable" search under that Amendment.

414 U.S. at 235, 94 S.Ct. at 477.

In *Edwards*, the defendant was arrested for an attempted break-in. After investigation of the scene revealed that a pry bar had been used on a window sill, the authorities decided to examine the defendant's clothing. The Court held that the warrantless search and seizure of the clothing did

not violate the Fourth Amendment, and that once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. Quoting a First Circuit case, the Court went on to state:

> While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.

415 U.S. at 808, 809, 94 S.Ct. at 1239, 1240.

Just as the police in *Robinson* could, incident to a lawful arrest, search the defendant's person, including the contents of a cigarette package found in the defendant's pocket, so too could the search incident to Passaro's arrest include an inspection of the contents of his wallet to discover evidence of crime. *United States v. Oaxaca, supra; United States v. Castro*, 596 F.2d 674, 677 (5th Cir. 1979). Under *Edwards*, "searches and seizures that could be made on the spot at the time of the arrest may legally be conducted later when the accused arrives at the place of detention." 415 U.S. at 803, 94 S.Ct. at 1237. The search here was valid and reasonable and the evidence seized therefrom was admissible even though it was unrelated to the crime for which Passaro was arrested. *Ray v. United States*, 412 F.2d 1052, 1054 (9th Cir. 1969), *cited with approval in United States v. Edwards*, 415 U.S. at 803 n.4, 94 S.Ct. at 1237.

In ruling as we do, we have concluded that *United States v. Chadwick, supra*, and *United States v. Schleis, supra*, are not applicable to the case at bar. In *Chadwick* the Court held that "By placing personal effects inside a double-locked footlocker, [the defendants had] manifested an expectation that the contents would remain free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause." 433 U.S. at 11, 97 S.Ct. at 2483. In the case at bar, the factual setting of the searched item is easily distinguishable. Unlike a double-locked footlocker, which is clearly separate from the person of the arrestee, the wallet found in the pocket of Mr. Passaro was an element of his clothing, his person, which is, for a reasonable time following a legal arrest, taken out of the realm of protection from police interest. *Robinson* and *Edwards, supra*.[1] We likewise distinguish *United States v. Schleis, supra*, in that *Schleis* involved a locked brief case. *Cf. United States v. Garcia*, 605 F.2d 349 (7th Cir. 1979).

## V — Prosecutorial Comment

The last allegation of error is that the prosecutor, in final argument, improperly commented on defendant's failure to testify and the lack of exculpatory evidence.

■ With respect to whether a prosecutor may comment on a defendant's failure to present witnesses, it is clear that such comment is proper, so long as it is not phrased as to call attention to defendant's own failure to testify. *United States v. Castillo*, 549 F.2d 583, 584 (9th Cir. 1976); *United States v. Murray*, 530 F.2d 856, 857 (9th Cir. 1976). In the instant appeal, we hold that the prosecutor's comments concerning failure to present exculpatory witnesses was proper argument.

■ Regarding references to defendant's attorney, it is clear from the record that defense counsel disputed the residence of his client at 12180 Alba Road, such residence having been supported by the Government's evidence. In light of this denial, we find that it was proper argument for the prosecutor to refer to defense counsel when asking why an innocent interpretation of the evidence was not forthcoming.

---

**1.** See 433 U.S. at 16, n. 10, where the *Chadwick* court distinguishes *Robinson* and *Edwards*.

■ Finally, our attention is focused by defendant upon a single reference in the prosecutor's argument:

> And the next question, of course, is—it's a bit redundant, so I'll be quick—why can't the *defendant* just come out and say "I was living at Alba Road, and the circumstances were A, B, C and D"? Why can't his attorney present this interpretation to you? Because the explanation doesn't exist, that's why. (Emphasis added.)

Defendant argues that this single reference to his failure to testify explicitly violated the self-incrimination clause of the Fifth Amendment. The Government argues that from the broader context, and even from the immediately surrounding sentences, it was clear to all present that the generic term "defendant" was intended to refer in this instance to Passaro's attorney. Although the prosecutor may have intended the remark as a generic reference to the defense, the jury may have literally viewed the sentence as referring to defendant personally. If that be the case, then we are faced with error under the Court's holding in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). However, even assuming a *Griffin* error, we are convinced that any error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We base this holding on the facts that the single sentence is an isolated occurrence; that there was no attempt to link a conclusion of guilt with defendant's silence; and there was a lack of substantial evidence in support of acquittal.

AFFIRMED.