**UNITED STATES of America,**
Plaintiff-Appellee,

v.

**William Todd ARMSTRONG, Kenneth W. Myrick, and Owen K. Stephenson, Defendants-Appellants.**

Nos. 80–1507 to 80–1509.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 13, 1981.

Decided Aug. 17, 1981.

Rehearing and Rehearing En Banc Denied Oct. 16, 1981.

Anne Flower Cumings, Cumings & Jordan, San Francisco, Cal., for Armstrong.

Stephen Zalkind, San Francisco, Cal., for Stephenson.

No appearance for Myrick.

John Burns, Asst. U. S. Atty., San Francisco, Cal., for United States.

Before MERRILL and WRIGHT, Circuit Judges, and EAST,* District Judge.

EAST, District Judge:

The above-named defendants-appellants (Armstrong, Myrick, and Stephenson) appeal their respective judgments of conviction and sentence for federal frauds. We note our jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

Appellants were engaged in a scheme soliciting advance fees for loan guarantee agreements. Myrick and Stephenson were the principals of a trust fund whose assets were to secure the guarantees. Armstrong acted as a finder, charging a fee to put financially troubled people in touch with Myrick and Stephenson. The two trustees would enter into an agreement with the

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

individual, for an additional fee, providing that the trust would guarantee certain loans. The trust's balance sheet was supplied to the individuals to assist in obtaining these loans. The balance sheet, however, listed assets which were overvalued or non-existent. The appellants were indicted based on this activity.

Myrick and Stephenson were tried on 15 counts including mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), inducement to travel interstate in order to defraud (18 U.S.C. § 2314), and giving false information in a loan application (18 U.S.C. § 1014). The two trustees were convicted on all counts. Armstrong was convicted on one count of wire fraud, with the jury being unable to reach a verdict on three other counts. The trial proceeded over the course of four weeks, and the jury spent seven days in a two week period deliberating before returning its partial verdict.

The most significant arguments appellants raise on appeal center on the activities of the jury and the District Court's response. Appellants point to a possible third party threat, to the revelation of the numerical split, to the health of one juror, and to an extra-jury communication in arguing that the District Court erred in not declaring a mistrial on all counts. Further, appellants characterize certain of the court's instructions as *Allen* charges [1] and claim that it impermissibly twice *Allen*-charged the jury.

Our careful review of the conduct of the jury and the action of the court reveals a tangled but not reversible course of events. We additionally reject appellants' other assignments of error.

## JURY CONDUCT

This was a jury of prolific writers. Notes flowed to the court like rainwater in the rain forests. Each note indicated another level of frustration and more incidents of jury turbulence. In the end, the jurors could not resolve all their differences—they failed to agree on all counts in spite of eight days of deliberation, and were forced to adjourn, having reached only a partial verdict.

During the seven days of deliberation, there were a number of difficulties. The principal incidents included:

1. After the court instructed the jury, but before deliberations even began, two of the jurors attempted to speak to the court reporter, apparently to tell her that one juror did not want to serve and wished to be dismissed. The court reporter told them not to speak to her but to write a note to the court. The court brought the jury in and asked if any member wished to be excused, but none did.

2. On the fourth day of deliberation, a note was received stating: "This jury is Dead Lock [*sic*]." Twenty minutes later a second note was received stating: "We are not dead lock [*sic*] as stated. We have not even voted on all the counts. We have one juror who refused to listen to your instructions." The court did not respond to these notes.

3. The next day a note was received from juror Fletcher that he wanted to go to his brother's funeral in St. Louis. After discussions with counsel, the court decided to allow him to leave on a Friday and return early the following week.

4. On the sixth day of deliberations, the court received a note from juror Gingras stating that her husband had taken two calls the night before which had used obscene language and said: " 'Tell your wife to stop hassling my brother-in-law at court.' " The court did not respond to this letter.

5. The following Tuesday morning, the last day of deliberations, juror Goldstein gave a letter to the court stating that she had a heart condition, that she was worried about the threats to one of the jurors, that juror No. 1 refused to follow the court's instructions, and she wished to be excused

1. *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

for health reasons. The court had the jury brought in, told the jurors they would be discharged soon, and gave the second alleged *Allen* charge (discussed below). The jury then returned to deliberate. Before lunch, the court asked juror Goldstein about her health, out of the presence of the other jurors. Before the court could stop her, she replied that she felt that the jury could come to a decision that afternoon and that she could remain to finish.

6. Soon after, as the jury went to lunch, the court received another note, this one signed by eight jurors. It stated many complaints about juror Jackson and noted juror Gingras' opinion that he was involved in the phone calls to her. After lunch, the court asked the foreperson if they were deadlocked and he allowed as how they were. Responding to the court's next question, he stated that the jury could return some verdicts. The court then told them to "go back and return a verdict then." Eight minutes later the jury returned guilty verdicts on some counts and no verdicts on others.

The appellants join in urging four grounds for reversal based on these incidents: the extraneous communication created an unrebutted presumption of prejudice; the revelation of deliberations and numerical split required a mistrial be declared; Goldstein's illness required a mistrial; and the first deadlock note required a mistrial. We consider the question of extraneous communication to be the most serious challenge to the verdict.

■ The appellants correctly assert that the presence of outside influences upon the jury establishes a presumption of prejudice, rebuttable only by a strong contrary showing by the Government. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *United States v. Goliday*, 468 F.2d 170, 171–72 (9th Cir. 1972), *cert. denied*, 410 U.S. 934, 93 S.Ct. 1386, 35 L.Ed.2d 597 (1973). The Government replies that the phone call involved here did not trigger this presumption because it was not an outside influence. It argues that the call was merely part of the intra-jury differences in this case. In determining whether we invoke this presumption, the Government would have us draw a line between outside communications concerning intra-jury matters and those which relate to other matters.

Line drawing often creates artificial, discrete units where in reality a continuum exists. We should not be too quick to subject real situations to overreaching compartmentalization. Doing so only leads us farther down the road to absurdity, grasping more and more illogically for the distinctions which preserve the lines and compartments we initially created with such reverence. It is far more judicially honest to acknowledge the continuum and assert the genuine basis for our decision. In questions about jury incidents, we are ultimately not so concerned with their nature as with the prejudice they may have worked on the fairness of the defendant's trial. *See United States v. Klee*, 494 F.2d 394 (9th Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974); *Cavness v. United States*, 187 F.2d 719 (9th Cir. 1951). Thus, having been presented with facts establishing a jury irregularity, whether or not we speak in terms of the rebuttable presumption of prejudice or of the fairness of the defendants' trial, we reach the same result.

In reviewing decisions on jury incidents, we recognize that the District Court is in a better position than we are to determine whether what happened was prejudicial. *United States v. Klee*. For this reason, we accord some deference to its decision when applying the abuse of discretion standard.

■ Of course, a careful look at the source of the jury influence will be a revealing step in evaluating possible prejudice. Here, there was indeed some third party involvement in the telephone calls to juror Gingras. At the least, her husband

was involved in receiving the outside calls and transmitting the messages to her. More significantly, they may have been made by a third party, although some believed that juror Jackson actually made the calls. But even if it was a third party who placed the calls, we are convinced that the District Court did not abuse its discretion in refusing to declare a mistrial as a result. The calls did not refer to the merits. They did not articulate threats nor were they identified with either side. Juror Gingras stated in her note to the court that she would not let the calls interfere with her duty as a juror.[2] These facts render this case quite unlike those where reversal has been required. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (attempt to bribe a juror); *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (jury exposed to extra-record facts and public opinion on the evidence and possible verdict); *United States v. Winkle*, 587 F.2d 705 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979) (jury found out that a co-defendant had pleaded guilty). The outside calls did inject an irregularity into the jury deliberations here, but we agree with the District Court that the essential fairness of the process was not compromised.

■ We find no merit in appellants' other three assignments of error concerning the jury incidents. Mere revelation of the numerical division of a jury, although to be discouraged, does not compel a mistrial. *See United States v. Williams*, 444 F.2d 108, 109 (9th Cir. 1971). Nor does the illness of a juror necessarily mean that the District Court must declare a mistrial. In the absence of coercion of the juror or jury due to the illness, there is, again, no prejudice. Here, the court apprised itself of Mrs. Goldstein's condition and was convinced, and she agreed, that she could continue for the short additional time it would take to finish the case. We see no reason to challenge the court's conclusion and we find no error. Finally, deference is accorded to the District Court in the timing of declaring a mistrial due to a deadlocked jury. *United States v. Cawley*, 630 F.2d 1345 (9th Cir. 1980). The jury recanted its first announcement of deadlock 20 minutes after it professed it. At the end of deliberations, the court properly allowed the jury to return the partial verdicts it could and dismissed it. There was no abuse of discretion.

## ALLEN CHARGES

As part of its initial instructions, the District Court included the following:

> When you retire, it will be your duty to discuss the case with your fellow jurors for the purpose of reaching an agreement, if you can do so.

> Each of you must decide the case for yourself, but you should do so only after considering all of the evidence, listening to the views of your fellow jurors and on discussing it fully with the other jurors. Do not be afraid to change your opinion if you think you are wrong, but do not come to a decision simply because other jurors may think that it is right.

> This case, as you can observe, has taken a great deal of time and effort to prepare and try. There is no reason to think that it could be better tried another time or that another jury would be better qualified to decide it. It is important, therefore, to reach a verdict if you can do so conscientiously. If, therefore, it looks at some point that you may have difficulty in reaching a unanimous verdict and if a substantially greater number of you are agreed on a verdict, the other jurors may want to ask themselves about the basis for their feelings when a substantial

---

2. Even though courts must apply an objective test in evaluating juror influence questions because jurors may not testify about their deliberations, *Miller v. United States*, 403 F.2d 77, 83 n.11 (2d Cir. 1968), it was proper for the District Court to consider juror Gingras' statements in her note since they were before the court.

number have reached a different conclusion.

It is important that you attempt to reach a verdict but, of course, only if each of you can do so after having made his or her own conscientious determination. Do not surrender an honest conviction as to the weight and effect of the evidence simply to arrive at a verdict.

Following receipt of the Goldstein note and after consultation with counsel, the court called the jury in and told the jurors they would be dismissed soon. The court then gave the following instruction before sending them back:

> At the beginning of the case, I gave you instructions concerning your sworn duty to return a verdict if you could in a manner consistent with your conscience. That is to say, without surrendering an honest belief and conviction that you held, and, of course, in a manner consistent with the evidence. I pointed out to you that it was important to return a verdict if you could do so without surrendering an honest conviction.
>
> You may consult those instructions again. They are in the jury room with you.

Appellants characterize both of these instructions as *Allen* charges and assert that each is improper. The first is deficient, they argue, because it does not instruct the majority to reexamine its views in light of those of the minority. The second, they claim, is a violation of the per se rule in this circuit against twice *Allen*-charging a jury.

■ Our standard for evaluating *Allen* charges was recently enunciated in *United States v. Beattie*, 613 F.2d 762, 764 (9th Cir.), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980): "[T]o determine the propriety of the trial court's use of an *Allen* charge in this case, we must examine the instruction 'in its context and under all the circumstances' to see if it had a coercive effect upon the jury. *Jenkins v. United States*, 380 U.S. 445, 446 [85 S.Ct.

1059, 1060, 13 L.Ed.2d 957] ... (1965)." The first instruction is only a mild form of the traditional *Allen* charge. *See* Devitt and Blackmar, 1 *Federal Jury Practice and Instructions* § 18.14, at 604–07 (3d ed. 1977). It does not make reference to the cost of this trial or the need for a new trial in the case of a deadlock. It is shorter and less pointed. Moreover, this instruction was given as part of the initial charging of the jury. We have recently noted that *Allen*-type charges given as part of initial instructions are not as coercive as those given after a deadlock. *United States v. Williams*, 624 F.2d 75 (9th Cir. 1980). Here, the court indicated that in the case of a deadlock, a substantial minority might want to reexamine its views in light of those of the majority. When using such language, it is better practice to also suggest that the majority should reexamine its position in light of the minority.[3] But the absence of such reciprocal language in these mild opening instructions does not render the charge impermissibly coercive. We conclude that giving the first charge was not error.

Appellants next assert that the second instruction, incorporating the first, was improper. They correctly note that this court has established a per se rule against repeating an *Allen* charge to a jury. *United States v. Seawell*, 550 F.2d 1159, 1162–63 (9th Cir. 1977). We are here called on to decide the effect of this new factual variation on the application of this rule. In *Seawell*, the jury had announced a deadlock and the court gave a full *Allen* charge. When informed that additional deliberation had failed to convince the two dissenting jurors, the court recalled the jury and reread the charge. The jury soon returned with a verdict of guilty. This court held that this was necessarily overly coercive and ruled that it is reversible error to twice *Allen*-charge a jury.

■ Here, however, the facts differ markedly. The first alleged *Allen* charge

---

**3.** It would also be better to withhold such a charge until a need for it appears.

was a shorter, milder form than that given in *Seawell*. Further, it was given as part of the opening instructions. The second charge was no more than a reminder of the first, and was milder still. Most importantly, the second pseudo-*Allen* charge was the only one given after the jury had reached impasse. The content and timing of these charges render them significantly less coercive than those encountered in *Seawell*. Accordingly, we find it unnecessary to extend the *Seawell* prohibition to this case.[4] Although the better practice in a short, simple case would be to utilize such an instruction only once, we conclude that the District Court's charges to the jury did not constitute reversible error.

## OTHER ISSUES

Appellants raise several other issues which may be disposed of briefly.

Appellants first argue that several improprieties tainted the evidence obtained in the search of the offices of Myrick and Stephenson.[5] They first argue that the affidavit in support of the search warrant did not establish probable cause to believe a specific crime had been committed. The affidavit in question was a detailed 15 page document setting forth information from numerous victims of the trust's loan guarantee promises, statements from experts concerning the asset valuation on the trust's balance sheet, and statements and information establishing why the records sought were at the location specified.

■■■ In order to issue a search warrant, a magistrate need only conclude from the affidavit that criminal activity is probably shown—a prima facie case is not neces-

sary. *United States v. Fried*, 576 F.2d 787 (9th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). In evaluating the affidavit, the magistrate should read it as a whole, "giving the language a common sense and realistic interpretation." *Id.* at 790, *quoting United States v. Bowers*, 534 F.2d 186, 192 n.5 (9th Cir.), *cert. denied*, 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311 (1976). "Great deference" is accorded the decision of the magistrate who concludes that such a showing has been made. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *United States v. Whitney*, 633 F.2d 902 (9th Cir. 1980). Hearsay statements from victims are considered reliable, *United States v. Mahler*, 442 F.2d 1172, 1174–75 (9th Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971), and appellants have presented no reason why the victims here should be considered different from others who are relied on for these purposes. Finally, the detailed pattern revealed by the affidavit combined with the information tending to discredit the asset valuation suggests that there is probably criminal activity present. This is sufficient information to support the issuance of the search warrant. *Spinelli v. United States*; and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

■■ We also conclude that the District Court acted properly in refusing to grant a hearing on questions of falsity in the affidavit. Whether or not the few inaccuracies may have been stated in reckless disregard for the truth, there existed sufficient details and facts in the affidavit exclusive of these possible errors to support probable cause for the issuance of the search war-

---

4. Appellants argue that because the jury had the instructions in writing in the jury room, the coercive nature of the *Allen* charge was enhanced. It is true that the opportunity to reexamine the charge keeps its message before the jury, and its availability strengthens the nature of the court's "reminder" instruction. However, under the facts of this case, we do not believe that this availability brings these

charges within the *Seawell* rule nor renders the District Court's action improperly coercive.

5. Although Armstrong also purports to join in objecting to the office search, we question whether he had a sufficient expectation of privacy to do so. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

rant. Thus, no hearing was necessary. *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

■ Appellants claim that certain documents were admitted into evidence which were seized in the search and were outside the scope of the warrant. Assuming, *arguendo*, that the five documents relating to trusts and parties not named in the warrant were improperly seized, it was harmless. These were a small portion of the documents properly seized and introduced. They were merely cumulative to the other documents which adequately support the convictions. Thus, no reversal is required. *Pasterchik v. United States*, 400 F.2d 696 (9th Cir. 1968), *cert. denied*, 395 U.S. 982, 89 S.Ct. 2142, 23 L.Ed.2d 770 (1969).

Appellants argue that it was error for the court to refer the jury to a document in evidence which was a copy of a document not in evidence which the jury asked about. Appellants, however, concede that the court could have allowed the Government to re-open its case for the purpose of introducing the requested exhibit. *Morgan v. United States*, 380 F.2d 686, 703 (9th Cir. 1967), *cert. denied*, 390 U.S. 962, 88 S.Ct. 1064, 19 L.Ed.2d 1160 (1968). Since the document referred to by the court was a copy of the unintroduced exhibit, there was no error.

■ Several issues are raised only by Armstrong. We conclude that they are without merit. There was sufficient evidence to find Armstrong guilty of fraud by wire. The jury could properly infer from the testimony about his numerous prior transactions that he knew or was in reckless disregard of the truth about the fraudulent nature of the trust's activities at the time he engaged in the activity for which he was convicted. *See United States v. Themy*, 624 F.2d 963, 965 (10th Cir. 1980).

■ Armstrong claims it was error not to grant his motion for severance, arguing that only a small portion of the trial was devoted to him. However, of the 39 witnesses, six were clients of his and three others were bankers testifying about those individuals. Since there were four defendants, this is not unduly disproportionate and does not make out the "clear," "manifest," or "undue" prejudice which must be shown to reverse a District Court's decision not to grant a Rule 14 motion to sever. *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

■ It was not error for the court to allow the prosecution to rebut the letter of one of Armstrong's clients with the details of the transaction. The District Court has wide discretion in determining what rebuttal evidence may be introduced and how it will be presented. *United States v. Perez*, 491 F.2d 167, 173 (9th Cir.), *cert. denied*, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974). Here, it was proper for the court to determine that in order that the letter not mislead the jury, the prosecution could put it in its proper context, even though that context did not technically bear on Armstrong's state of mind.

■ Finally, we dismiss the objection to the prosecution's comment on Armstrong's failure to take the stand. Although such comments are prohibited, *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Wilson v. United States*, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650 (1893), we will only reverse a conviction for this error if it appears that the comment may possibly have affected the verdict. Here, it was a single isolated statement;[6] it did not stress any inference of guilt because of the silence, and there were curative instructions. We conclude that this statement was harmless beyond a reasonable doubt. *United States v. Passaro*, 624 F.2d 938 (9th Cir. 1980), *cert. denied*,

---

6. The prosecution stated during its closing argument: "Did you hear him deny the misrepresentations, Ladies and Gentlemen?"

—— U.S. ——, 101 S.Ct. 925, 66 L.Ed.2d 842 (1981).

The judgments of conviction are each affirmed and the several mandates shall issue now.

AFFIRMED.

MERRILL, Circuit Judge, concurring:

I concur in Judge East's opinion but would like to add a word respecting the *Allen* charge.

I find nothing coercive or otherwise objectionable in giving a properly balanced *Allen* charge before the jury retires to deliberate. It seems to me to be sound advice, given in the abstract, as to how the jurors should handle a problem they are quite likely to encounter in the course of their deliberations. Further, I see nothing coercive or improper in permitting the jurors to have such an "outset *Allen* charge" in the jury room during deliberations. In neither case is the judge addressing the jury in the context of a deadlock.

It is in that context that the danger of coercion can arise from the giving of the charge. The danger is that the jury might conclude from the language of the charge and the refusal of the judge to accept the jury's report of deadlock that in the public interest a verdict must be reached. If, given in the context of deadlock, the charge sounds in terms of assistance—of advice as to how the jury might solve the problem it now faces—it is not *per se* coercive. If coercion exists it must be found not in the fact that the jury was directed to continue to deliberate, but in the language used in so directing it.

In *United States v. Seawell*, 550 F.2d 1159 (9th Cir. 1977), *cert. denied*, 439 U.S. 991, 99 S.Ct. 591, 58 L.Ed.2d 666 (1978), we held that when, without having been requested by the jury, the charge is given a second time in response to a second report of deadlock, it does not serve a purpose of assistance or instruction. Repeated at a time when it should still be ringing in the ears of the jurors from its first pronouncement it "becomes a lecture sounding in reproof," *id.* at 1163 and is *per se* coercive. That is not the case before us.