589 P.2d 434

**The STATE of Arizona, Appellee,**

v.

**Frank James VALENCIA, Appellant.**

**No. 3989.**

Supreme Court of Arizona,
In Banc.

Jan. 3, 1979.

Bruce E. Babbitt, Former Atty. Gen., John A. LaSota, Jr., Former Atty. Gen., Robert K. Corbin, Atty. Gen. by William J. Schafer III and R. Wayne Ford, Asst. Attys. Gen., Phoenix, for appellee.

Thomas G. Martin, Tucson, for appellant.

CAMERON, Chief Justice.

Defendant Frank James Valencia was adjudged guilty of first degree murder, A.R.S. § 13–452, following trial to a jury in the

Superior Court of Pima County. He was sentenced to death. A.R.S. § 13–453. He appeals from the verdict, judgment, and sentence.

We must answer the following questions on appeal:

1. Should the trial judge have disqualified himself from hearing the matter?
2. Was it error not to suppress two confessions made by the defendant?
3. Was it error for the trial court to have allowed oral testimony describing certain articles of clothing after the clothing had been suppressed?
4. Was it error for the trial judge to have refused to give a requested instruction on second degree murder?
5. Does the lack of jury participation in sentencing amount to a violation of the Sixth and Fourteenth Amendments to the United States Constitution?
6. Is A.R.S. § 13–454(F) constitutionally infirm for failure to denote age as a possible mitigating factor?

The facts necessary for a resolution of this appeal are as follows. At approximately 5:45 p. m. on 2 December 1975, Karen Louise Tweedy left her place of employment in the Transamerica Building in Tucson, Arizona. She went to the El Presidio Garage where her car was parked. Upon reaching her car, she opened the door and placed her purse on the passenger seat when she was tapped on the shoulder from behind by the defendant. As Karen Tweedy turned and saw the defendant, she apparently made a motion with her arm to push the defendant away or to in some way protect herself. The defendant then shot Karen Tweedy, a .22 caliber bullet hitting her just to the left of the bridge of her nose. She never regained consciousness and died five days later.

Immediately after the shooting, the defendant ran up the stairs, then apparently decided to return to the scene of the shooting. After seeing the victim who appeared dead, he again ran up the stairs and exited the garage on the ground floor through a door in the northeast corner of the garage.

There were two witnesses whose testimony placed defendant at the parking garage at the time of the shooting. One female witness rode in the same elevator with the defendant as she went to get her car in the garage. A second witness saw the defendant burst out of the stairway door when defendant left the garage following the shooting.

Some three months later, on the 11th of March 1976, the defendant, who at that time was being held at the Pima County Juvenile Court Center, volunteered a statement to the police that he had information concerning the Tweedy murder. Detective Hector Marmion of the Tucson Police Department took the statement wherein the defendant stated that the murder was committed by one Tony Llama.

The next day the defendant voluntarily went with Detective Marmion and another officer in an effort to locate the alleged Tony Llama and others he had implicated in the crime. Five days later, on the morning of 17 March 1976, Detective Marmion and Sgt. Bunting picked up the defendant from the Pima County Juvenile Court Center and took him to the police department for the purpose of giving him a polygraph examination to test the credibility of his "Tony Llama" statement.

En route to the police station, the defendant told Detective Marmion in Spanish that it would not be necessary to go through with the polygraph test, that he, Valencia, had killed Karen Tweedy in the course of an attempted robbery. At the time of the murder, Valencia was 16 years old and at the time of his confession and arrest he was 17 years old.

Defendant's fingerprints were subsequently taken, and the expert testimony at trial indicated a positive match between defendant's prints and the prints removed from the stairway rail of the parking garage by police technicians the night of the murder.

Following trial to a jury, a verdict and judgment of guilt and a sentence of death, defendant appeals.

## SHOULD THE JUDGE HAVE DISQUALIFIED HIMSELF?

■ Defendant initially argues that the trial judge should have disqualified himself from trying the case because the trial judge knew the deceased when she worked for the court administrator's office and that the judge agreed to perform the ceremony when the deceased was to be married. When asked by defense counsel, the trial judge stated his belief that he could try the case fairly and without prejudice and therefore denied defense counsel's motion that he disqualify himself.

Defense counsel then made a motion to disqualify the trial judge for cause pursuant to Rule 10.1, Arizona Rules of Criminal Procedure, 17 A.R.S. Section (c) of Rule 10.1 provides for a hearing by another judge when the impartiality of a judge is timely challenged. At the hearing conducted by Judge Druke, Judge Gin was examined extensively by defendant's attorney. Judge Gin indicated that the deceased had worked for the Court Administrator's office, that he saw her daily, and that she later left to work for a private attorney. Judge Gin testified:

"Q  And did you talk with her about any other subjects that you can recall?

"A  Well, on one occasion she indicated she was going with somebody and they might get married, and she asked me if I would be willing to perform the service, and I said that I would be very happy to.

"Q  Did she tell you there was any particular reason she had asked you to perform the service as opposed to someone else?

"A  No.

"Q  Is it possible that it was—excuse me, not is it possible, but did she indicate to you whether or not you were her favorite judge, or you were the only judge that she—

"A  Well, I would hope I was, but I don't know, she never did indicate.

"Q  You don't know of her asking any other judge to perform the ceremony?

"A  No.

"Q  And how long ago was it that she requested you to perform this ceremony?

"A  It must have been about three or four months before her death.

"Q  That would have placed it approximately September or October of 1975?

"A  I don't even know the date of death so I can't—

"Q  All right. Assuming that the date of death is December 7, 1975, would it have been approximately in the month of September or so?

"A  Well, it could very well be if it works out that way.

"Q  All right. How do you feel about trying the person accused of her—of killing her?

"A  I really have no feelings about it one way or the other. I think I could be fair and impartial in the matter and objective.

"Q  With your knowledge of her, or your individual awareness of her as a person, would this have any effect upon your considerations of punishment?

"A  I don't think so. I honestly don't think it would.

"Q  Can you say that with a certainty, or is that sort of—or is that the best you can do?

"A  Well, I can say it with a certainty. I know that I had other occasions where I have had people before me whom I have known and had disclosed to counsel and counsel permitted me to go ahead and try the case and I thought I was impartial in those cases.

"Q  Did any of those cases involve a charge as serious as homicide?

"A  No.

"Q  Were any of those cases comparable, or was your acquaintanceship with the parties involved comparable with that of Karen Tweedy?

"A  Better.

"Q You were better acquainted with the other parties. Do you have, oh, social involvement with Karen Tweedy's—the people who were Karen Tweedy's employers?

"A No, I don't even know who her employers were.

"Q Were you ever approached to contribute to the—or make a promise to contribute to the reward fund that was at one time solicited on her behalf?

"A No, I was not asked to contribute and I wasn't aware there was such a fund."

At the close of testimony, the hearing judge stated that he was unable to find by a preponderance of the evidence as required by Rule 10.1 that the trial judge had an interest or prejudice sufficient to disqualify him from hearing the matter. We have read the record and we agree.

■ The defendant contends, however, that since the deceased was known to virtually all court personnel by reason of her previous employment in the clerk's office, he was precluded from using his peremptory challenge under Rule 10.2 because the judge to whom the case might be assigned could very well have known the decedent better than did the challenged judge. Rule 10.2 allows counsel to request a change of judge once without any showing of bias or interest.

We agree with defendant that this might be the result of a peremptory challenge pursuant to Rule 10.2 just as it is possible that after a peremptory challenge of a juror, another less desirable juror might take the challenged juror's place. This is the risk the party takes when a judge is peremptorily challenged. In the instant case, since no peremptory challenge was made, no prejudice has been demonstrated. We also note that no request was made for a judge from another county. We find no error.

## FAILURE TO SUPPRESS CONFESSIONS

■ At the time of defendant's confessions, he was 17 years old. The test in Arizona to determine the voluntary, knowing, and intelligent waiver of the right to remain silent by a juvenile is the "totality of the circumstances" test. *State v. Rodriguez,* 113 Ariz. 409, 555 P.2d 655 (1976); *State v. Taylor,* 112 Ariz. 68, 537 P.2d 938 (1975), cert. den. 424 U.S. 921, 96 S.Ct. 1127, 47 L.Ed.2d 328 (1976).

■ The testimony indicates that on the morning of 17 March 1976, over three months after the murder, Detective Marmion and Sgt. Bunting picked up Valencia from the Pima County Juvenile Court Center for the purpose of giving him a polygraph examination at the police department to test the veracity of defendant's previously volunteered statements implicating "Tony Llama" and others in the Tweedy homicide. This polygraph examination had been previously arranged with defendant's then attorney.

Detective Marmion testified that although defendant was not himself a suspect at that time, since he was going to be interrogated Detective Marmion advised him of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Detective Marmion spoke to the defendant in English and Spanish in inquiring whether the defendant understood his rights. In each case, the defendant answered that he understood the warnings and his rights thereunder. In addition to the Miranda warnings, Detective Marmion explained the polygraph test to the defendant.

Following this conversation, the defendant told Detective Marmion in Spanish that it was not necessary to go through with the polygraph, that he had killed Karen Tweedy. Detective Marmion asked the defendant if he would be willing to repeat his confession in English to Sgt. Bunting, who was driving the vehicle. Defendant said he would, turned and repeated to Sgt. Bunting the statement that he (Valencia) had killed Karen Tweedy. Defendant repeated his confession a third time to allow Sgt. Bunting and Detective Marmion the chance to record it on tape. At no time during any of

these three confessions did the defendant ask for an attorney or refuse to answer questions.

Later at the police department, defendant was given an opportunity to speak privately with his attorney. During that conversation, the defendant was advised by his attorney to remain silent. In spite of this advice, defendant later told Detective Marmion that he would be willing to give a statement. When asked about the whereabouts of the murder weapon, defendant further stated that his mother had the gun, that he would reveal where the gun was, and a search warrant would be unnecessary because he would cooperate in any way.

At this time, the defendant also requested to speak with his mother. Defendant's brief urges us to consider defendant's statement in this regard as the equivalent of asking for his attorney and urges that questioning should have then ceased. We do not agree.

The record does not support the defendant's contention that this was, in fact, a request for an attorney. The taped statement of the defendant was, in part, as follows:

"Q [BY DETECTIVE MARMION] Frank, you remember Sergeant Bunting when we took the statements in the car?

"A Yes.

"Q Okay, when we walked out of the car after you had given us a statement and we were walking in the Police Station, your attorney was walking in front of us with Sergeant Bunting, do you remember?

"A Yes.

"Q And you and I were walking together?

"A Yes.

    \*   \*   \*   \*   \*   \*

"Q Did I ask you any questions?

"A No.

"Q Went right upstairs?

"A Yes.

"Q You talked to your attorney?

"A Yes.

"Q Okay. And then after you talked to your attorney in the Lieutenant's office did I talk to you again in there for a couple of minutes? Do you remember me going into the office?

"A Yes.

"Q And you said that you would be willing to give us a statement, is that right?

"A Yes.

    \*   \*   \*   \*   \*   \*

"Q Okay. After we left your house, we came straight down here to Juvenile Home, isn't it true that I told you that you could have an attorney or your mother or anyone else present there?

"A Yes, that's true.

"Q And you said your conscience was bothering you?

"A Yes.

"Q Why did you decide to tell me all these things, Frank? Why—why is it that you—can you repeat to me what you said, what you told me earlier?

"A Well, I—

"Q Why—why you decided to tell me all this?

"A I just couldn't live with knowing that I did somebody wrong, you know, and not telling nobody so I knew I had to get it out sooner or later so, you know, I trust you, you know, and you trusted me so, you know, I believe I, you know, so I told you what—what all I did.

"Q Okay. Up to this point I haven't made you any promises, have I?

"A No.

"Q Okay. After you talked to your attorney, Frank—I will call you Poncho, okay, because this is what I've always called you, okay? Poncho after you talked to your attorney I had again asked you if you wanted anybody present and you indicated to me that you wanted your—you would like to see your mom, you wanted her present, is that correct?

"A Yes.

"Q Did I immediately take you to your mother?

"A Yes.

* * * * * *

"Q And you understand that you could have had your mother, your attorney or anybody else?

"A Yes.

"Q Did you, at any time, from the time that I first saw you this morning or at any time on prior occasions with you, prior to—did you at any time indicate to me in any manner that you wished to have an attorney or anybody else present while I was with you?

"A No.

"Q Okay. May I have your full name again?

"A Frank James Valencia.

"MR. MARMION: This concludes our interview."

[redacted] We have no difficulty in concluding that the "totality of the circumstances" indicates that defendant knowingly, voluntarily, and intelligently waived his right to counsel and that his confessions were voluntary. The trial court properly allowed those statements to be introduced into evidence. We find no error. *State v. Taylor,* supra.

ORAL TESTIMONY

[redacted] The defendant next urges that it was error for the trial court to have allowed oral testimony describing certain articles of clothing that had been suppressed.

Contemporaneous with defendant's statements to the police implicating one "Tony Llama" and others in the Tweedy murder, defendant had also come under investigation in connection with a possible rape charge. On 16 March, one day before the defendant confessed to the Tweedy murder, Detective Donald Jorgenson received and executed a search warrant on the home of the defendant. Detective Jorgenson was apparently in charge of the rape investigation, and had sought and obtained the warrant for the purpose of searching for certain evidence connected with the rape charge. However, Jorgenson was also one of the detectives called in to interview possible witnesses in the parking garage immediately following the Tweedy murder. As a result of that interviewing, Detective Jorgenson knew details and descriptions about the killing not known by other officers.

In the process of searching for items connected with the rape investigation, Detective Jorgenson seized a ski cap because it fit the description of one worn by the assailant in the Tweedy murder. He also observed, but did not seize, a dark brown jacket hanging in the defendant's closet. Later Detective Marmion seized the jacket.

At trial, the defense counsel argued successfully that the ski cap and jacket should be suppressed from introduction into evidence. The judge did allow Detective Jorgenson to testify, however, regarding the articles (hat and jacket) he observed while he was on the premises. Defendant contends that a prior Court of Appeals case holds this evidence inadmissible. Our Court of Appeals stated:

> "[T]he exclusionary rule * * * is broader than the exclusion of items of personal property alone. It applies to oral evidence adduced from an officer's testimony as to what he saw or found pursuant to an illegal search." *State v. Hunt,* 2 Ariz.App. 6, 11–12, 406 P.2d 208, 213–14 (1965).

We do not believe *Hunt,* supra, supports defendant's position. In *Hunt,* the Court of Appeals went on to hold that testimony of what the officer saw was admissible because the officer was legally on the premises. In that regard, it is no different from the facts in the instant case. Detective Jorgenson was in the house pursuant to a valid search warrant. The hat and jacket were observed by him during the course of a valid, lawful search. We have stated:

> "There is, of course, no search within the meaning of the Fourth Amendment where the objects are within the plain view of a police officer who has the right

to be in the position to view the objects and it cannot be an unreasonable search if the officer observes whatever is in plain sight. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). * * * " *State v. Childs,* 110 Ariz. 389, 391, 519 P.2d 854, 856 (1974).

We find no error.

## FAILURE TO INSTRUCT THE JURY ON SECOND DEGREE MURDER

The defendant next contends that it was error to refuse to give his requested instruction on second degree murder. We do not agree.

■ The trial court should instruct the jury on every degree or grade of offense that is supported by the evidence, *State v. Brady,* 105 Ariz. 190, 461 P.2d 488 (1969); *State v. Sorensen,* 104 Ariz. 503, 455 P.2d 981 (1969).

■ Our statute reads as follows:

"A murder which is * * * committed * * * in the perpetration of, or attempt to perpetrate, * * * robbery * * * is murder of the first degree. All other kinds of murder are of the second degree." A.R.S. § 13–452.

We have stated that a jury may not be instructed on a lesser degree of murder than first degree where the evidence indicates it was committed in the course of a robbery. *State v. Clayton,* 109 Ariz. 587, 514 P.2d 720 (1973); *State v. Kruchten,* 101 Ariz. 186, 417 P.2d 510 (1966); *State v. Folk,* 78 Ariz. 205, 277 P.2d 1016 (1954).

Under the evidence in the instant case, the murder was committed in the course of a robbery attempt and the court properly refused an instruction for second degree murder. *State v. Folk,* supra.

## LACK OF JURY PARTICIPATION IN SENTENCING

■ Defendant contends that the lack of jury participation in capital sentencing violates defendant's Sixth Amendment right to trial by jury made applicable to the States through the due process clause of the Fourteenth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). We do not agree. We believe that the recent case of *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253, is dispositive of this question. In Watson, we cited the following language of the United States Supreme Court in their rejection of this argument:

"The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury. This Court has pointed out that jury sentencing in a capital case can perform an important societal function, *Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases. (footnote omitted)." *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913, 922–23 (1976).

We find no error.

## FAILURE TO DENOTE AGE AS A POSSIBLE MITIGATING FACTOR

Defendant contends that Arizona's death penalty statute, A.R.S. § 13–453, is constitutionally infirm for failing to denote age as a possible mitigating factor.

We also dealt with this issue in *State v. Watson,* supra, wherein we held that limiting the number of mitigating factors the court could consider in sentencing was unconstitutional. We then remanded the matter for resentencing.

Defendant further contends that he was also denied equal protection of the law by not being tried as a juvenile where his age would be considered in sentencing. We believe that *Watson,* supra, which allows age

to be considered in sentencing, is dispositive of this issue.

The conviction and judgment of guilt are affirmed. This case is remanded to the trial court for resentencing pursuant to *State v. Watson, supra.*

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.