686 P.2d 1248

**STATE of Arizona, Appellee,**

v.

**Lee Roy PERKINS, Appellant.**

**No. 5990.**

Supreme Court of Arizona,
En Banc.

July 17, 1984.

282

Robert K. Corbin, Atty. Gen. by William J. Schafer III, and Gary A. Fadell, Asst. Attys. Gen., Phoenix, for appellee.

George M. Sterling, Jr. and John M. Antieau, Phoenix, for appellant.

HAYS, Justice.

Appellant, Lee Roy Perkins, was convicted of nine counts of armed robbery, A.R.S. § 13–1904, and one count of aggravated assault, A.R.S. § 13–1204. Because appellant was on parole when he committed the instant offenses, he was given a life imprisonment sentence for each count. *See* A.R.S. § 13–604.01. The sentence for count 1 (armed robbery) was ordered to run consecutively to the unexpired portion of the sentence from which appellant had been paroled. The sentences for counts 2 through 8 were ordered to run concurrently with the sentence for count 1. The sentence for count 9 was ordered to run consecutively to the sentence for counts 1 through 8. Finally, the sentence for count 10 (aggravated assault) was ordered to run consecutively to count 9. The case was automatically appealed to this court. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. § 13–4031, and A.R.S. § 13–4035. The judgments of conviction are affirmed. The sentences are set aside and the case is remanded to the trial court for resentencing.

Six main issues confront us:

1. whether the trial court erred in ruling that appellant's prior armed robbery convictions would be admissible to impeach appellant if he testified;

2. whether the trial judge should have recused himself;

3. whether identifications by three of the victims were improperly admitted;

4. whether a violation of the rule excluding witnesses from the proceedings requires reversal;

5. whether appellant was denied effective assistance of counsel at sentencing; and

6. whether appellant was properly sentenced.

In three separate incidents during the late hours of September 25, 1982 and early hours of September 26, 1982, ten young people were accosted at the Salt River bottom, where they had been partying. Nine of the victims were robbed and one, not possessing a wallet or purse to give to the assailants, was assaulted.

The first incident involved four victims in one car as they were travelling on the river bottom toward the party area. A car came from behind and cut them off, forcing them to stop. Appellant, codefendant Don Meeker, and James Reed departed from the overtaking car, robbed the four victims, and left.

The second incident involved two victims, Timothy Thompson and Scott Gronek, as they were leaving the party area. Like the first incident, a car came from behind the victims and cut them off, forcing them to stop. This time two people exited the robbers' car. The third person remained in the back seat of the car. Codefendant Meeker went to the driver's side of the victims' car, where Thompson was sitting, and put a handgun to Thompson's head. Appellant went to the passenger side of the car, where Gronek was sitting, and held a shotgun across Gronek's throat. After Thompson and Gronek gave their wallets to the robbers, appellant hit Gronek in the nose with the gun.

A few minutes after the robbers left the scene, Thompson and Gronek looked for a telephone to call the police. As the two victims approached a nearby Circle K convenience store, they saw the robbers' car. Thompson and Gronek drove into the Circle K parking lot and parked behind the robbers' car. The victim saw the two assailants inside the Circle K. A third person was in the back seat of the robbers' car. Thompson and Gronek then drove to the side of the store so the robbers could not see them.

At the side of the Circle K a Barbara Pell was using a pay telephone to call the police. Pell and three friends had also just been accosted while leaving the river bottom. Pell had been in a car that was forced to stop in the same manner as in the first two incidents described above. Appellant and Meeker had existed the overtaking car, wielded a handgun and a shotgun, forced the four occupants of the stopped car to give up their valuables, and left. A third person had remained inside the robbers' car. Pell had not been carrying a wallet or purse, so although she was assaulted, she was not robbed.

The car in which Pell had been a passenger was temporarily immobile after the robbery, so Pell obtained a ride from friends leaving the party area who drove by shortly after the robbery. These friends took Pell to the Circle K to phone the police. Within five minutes after the robbery, Pell was at the Circle K, and could see the assailants' car in the lot and the assailants themselves at the checkout counter in the store.

While Pell was on the phone talking with police, the robbers entered their car and drove away. Thompson and Gronek followed them. An officer, answering the police radio, caught up with Thompson and Gronek. Those two indicated to the officer that the car they were following contained the robbers. Meanwhile two other officers picked up Pell at the Circle K. Police eventually stopped the assailants, and at the arrest site, Thompson, Gronek, and Pell all identified appellant as one of the robbers.

# I. IMPEACHMENT WITH PRIOR CONVICTIONS

The trial court held a pretrial hearing to determine the admissibility, for impeachment purposes, of appellant's prior convictions. The prior felonies the state wished to use to impeach appellant if he testified were three 1978 convictions of fraud (drawing checks on insufficient funds) and two 1979 convictions of armed robbery. After the hearing, the court ruled that the fraud convictions would be admissible if appellant testified, and took under advisement the armed robbery convictions. The next day the court ruled the armed robbery convictions admissible, explicit finding their probative value to outweigh any prejudicial effect. Appellant did not testify at trial. Appellant presently contests only the ruling concerning the armed robbery convictions.

The admissibility, for impeachment purposes, of prior convictions is governed by Arizona Rules of Evidence, rule 609. That rule provides that the general rule for admissibility is that (1) the probative value of the prior felony must outweigh its prejudicial effect, and (2) the prior crime must have involved dishonesty, or it must have been punishable by death or imprisonment in excess of one year under the law under which defendant was convicted. We will not upset the trial court's ruling absent an abuse of discretion. *State v. Harding*, 141 Ariz. 492 at 498–499, 687 P.2d 1247 at 1253–1254 (1984).

Appellant first argues that the trial court erred because it did not state on the record the specific facts and circumstances supporting its conclusion that the probative value of the prior armed robbery convictions outweighed their prejudicial effect. Appellant cites *State v. Sullivan*, 130 Ariz. 213, 635 P.2d 501 (1981), and *State v. Ellerson*, 125 Ariz. 249, 609 P.2d 64 (1980). *Ellerson* is the case in which we discussed at length the findings a court should make before ruling on the admissibility of prior

convictions. In *Ellerson* the error was that the trial court did not state explicitly that, as required by rule 609, the probative value of the prior convictions outweighed their prejudicial effect. The error was not fatal because it appeared from a complete reading of the transcript of the hearing on the motion that the court did consider the matters required by rule 609. The transcript revealed that all the prior convictions were fully discussed by the judge and counsel during the hearing. In *Ellerson* we also discussed what a hearing in this context should entail. (It need not be extensive. The government should state the date, nature, and place of conviction, and why it should be admitted. The defendant should be permitted to rebut the government's presentation.) We further said:

> The better procedure would be for the court before evidence of a prior criminal conviction is admitted for impeachment purposes, to "make an on-the-record finding based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of unfair prejudice." *United States v. Mahler*, 579 F.2d 730, 734 (2d Cir.1978), cert. denied, 439 U.S. 991, 99 S.Ct. 592, 58 L.Ed.2d 666, reh. denied, 439 U.S. 1104, 99 S.Ct. 885, 59 L.Ed.2d 66 (1979).

125 Ariz. at 252, 609 P.2d at 67.

In *Sullivan, supra*, also cited by appellant, we said:

> As we pointed out in *State v. Ellerson*, supra at 252, 609 P.2d 64, when the State intends to offer a prior conviction in evidence for impeachment of a defendant, the trial judge should require the State to show the date, place and nature of the prior conviction and any other relevant circumstance. The defendant should be permitted to rebut the State's showing relevancy by pointing out the prejudicial effect to the defendant if the evidence is admitted. The trial judge should consider the matters presented and before admitting the evidence, he should make a finding on the record that the probative value of the evidence substantially out-weighs the danger of unfair prejudice. The procedure followed by the trial court in this case substantially complied with that suggested by *State v. Ellerson*, supra.

130 Ariz. at 217, 635 P.2d at 505.

*Ellerson* and *Sullivan* demonstrate that with regard to the admission of evidence of prior convictions for impeachment purposes we will not upset a trial court's ruling so long as the record shows that the court carefully considered the matter. In the present case, unlike in *Ellerson*, the court explicitly found that the probative value of the armed robbery convictions outweighed their prejudicial effect. The court did not state on the record the specific facts and circumstances supporting its finding. However, as in *Sullivan* the record reveals that the procedure followed by the trial court substantially complied with that suggested in *Ellerson* and that the court carefully considered the matter. After a hearing complying with the suggestions of *Ellerson* the court took the matter under advisement, read the cases cited during the hearing, and made its decision the next day. We find no error.

[6, 7] Appellant also argues that the trial court erred by its substantive ruling that the probative value of the prior armed robbery convictions outweighed their prejudicial effect. Appellant further argues that even if the court did not err in ruling that evidence of the prior convictions would be admissible if appellant testified, it did err by not limiting the admissibility to the mere fact of prior convictions rather than also to the specific nature of those convictions. Appellant asserts that it was error not to limit the admissible evidence to the mere fact of prior convictions because the prior convictions were identical to the charges then pending.

"Prior convictions are not inadmissible per se on the issue of credibility merely because the offense involved is identical to that for which the defendant is on trial." *State v. Dixon*, 126 Ariz. 613, 618, 617 P.2d 779, 784 (App.1980); *see Sullivan, supra*, 130 Ariz. at 217, 635 P.2d at 505 (prior

conviction of possession of a narcotic drug admissible where pending charge was selling a narcotic drug); *United States v. Oaxaca*, 569 F.2d 518, 526–27 (9th Cir.1978). Further, although when the prior felony is identical to the pending charges, trial courts on occasion have limited the admissible evidence to the fact of a prior felony conviction, *see, e.g., State v. Watkins*, 133 Ariz. 1, 2, 648 P.2d 116, 117 (1982), such a procedure is not required, *see Sullivan, supra; State v. Woratzeck*, 130 Ariz. 499, 502, 637 P.2d 301, 304 (App.1981); *Dixon, supra; Oaxaca, supra*. Rather, the determination whether the probative value of a prior conviction outweighs the prejudicial effect should be made on a case-by-case basis.

▮ In the present case we find that the trial judge did not abuse his discretion by ruling that evidence of the prior armed robbery convictions would be admissible if appellant testified. All felonies are probative of the credibility of a defendant. *Harding, supra*, 141 Ariz. at 499, 687 P.2d at 1254. Although a prior robbery conviction is not as probative of credibility as is, for example, a prior perjury conviction, "[i]t is a crime which is both larcenous and assaultive, and thus bears in part on the perpetrator's integrity and veracity." *People v. Rist*, 16 Cal.3d 211, 220, 127 Cal. Rptr. 457, 463, 545 P.2d 833, 839 (1976); *see People v. Duran*, 140 Cal.App.3d 485, 189 Cal.Rptr. 595, 603 (1983). Adding to the probative value of appellant's prior armed robbery convictions is their recency—appellant was convicted in 1978 and released only a month before committing the instant offenses. *See, e.g., Gordon v. United States*, 383 F.2d 936 (D.C.Cir.1967) (recency of a prior conviction is a factor bearing on its probative value). Also adding to the probative value of appellant's convictions is the fact that he had noticed an alibi defense. *See Oaxaca, supra*, 569 F.2d at 526–27; *Dixon, supra*, 126 Ariz. at 618, 617 P.2d at 784. Finally, "[i]f appellant had testified, it would have been important for the jury, when considering appellant's credibility, to possess information about appellant's history of convictions, so as not to be improperly led to believe that appellant had a pristine past or that his actions reflecting negatively on his credibility were mere isolated incidents." *Harding, supra*, 141 Ariz. at 499, 687 P.2d at 1254. The trial court did not abuse its discretion by ruling that evidence of appellant's prior armed robbery convictions would be admissible to impeach appellant if he testified.

## II. JUDGE RECUSAL

Appellant claims the trial judge committed reversible error by failing to recuse himself. Appellant asserts that the trial judge's knowledge of potential perjury by appellant combined with information in two letters sent to the judge by codefendant Meeker prejudiced the judge such that he should have recused himself.

On May 11, 1983, when pretrial motions were being considered, counsel for appellant and counsel for Meeker moved to withdraw because they anticipated perjury from the defendants. The court denied the motions.

On a later date, the judge received a letter from Meeker, dated May 11, 1983. Midway through the trial, on the morning of May 18, 1983, the judge received another letter from Meeker, dated May 14, 1983. In this letter, Meeker complained that his plea agreement was withdrawn because appellant insisted on going to trial, implied that he and appellant were involved in the crimes for which they were on trial by writing "is there anyway for me to gain immunity from the D.A. by telling the absolute truth and the prospective part each individual person, including myself, played?", and placed appellant in a bad light by stating "I am being drug down by the Aryan Brotherhood and if I were to just up and say something to Perkins and still go to prison I wouldn't stand a good chance of coming out." In the afternoon of May 18, the judge saw all counsel in chambers and informed them of the letters. The court also provided copies of the letters to all counsel, and urged Meeker's

counsel to suggest to Meeker that he stop sending letters.

The next day, when trial was still proceeding, appellant's counsel moved for a "mistrial ... or in the alternative a severance and a new trial in front of another Judge." Counsel argued that the letters from Meeker and the previously disclosed possible perjury "can't help but prejudice it [the court] against my client." The court denied the motion.

Finally, after verdicts of guilty were rendered, appellant moved for a new trial. The court denied that motion, also.

█ The trial judge properly denied any motion to remove the judge for cause during the trial. Under Arizona Rules of Criminal Procedure, rule 10.1, motions for change of judge for cause may not be made after commencement of trial. Because the trial in this case was already in process when appellant moved for a "mistrial or in the alternative a severance," appellant's motion was foreclosed at that time. Appellant's means of redress was to move for a new trial after a finding of guilt. *See* rule 24.1; *State v. Leslie,* 136 Ariz. 463, 666 P.2d 1072 (1983). As stated above, appellant did subsequently move for a new trial and that motion was denied. We now consider the propriety of that denial.

█ A defendant has a "right to trial presided over by a judge who is 'impartial and free of bias or prejudice.'" *State v. Brown,* 124 Ariz. 97, 99, 602 P.2d 478, 480 (1979) (quoting *State v. Neil,* 102 Ariz. 110, 112, 425 P.2d 842, 844 (1967)). "Bias and prejudice means a hostile feeling or spirit of ill-will ... towards one of the litigants. The fact that a judge may have an opinion as to the merits of the cause or a strong feeling about the type of litigation involved, does not make the judge biased or prejudiced." *State v. Myers,* 117 Ariz. 79, 86, 570 P.2d 1252, 1259 (1977), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978) (quoting *In re Guardianship of Styer,* 24 Ariz.App. 148, 151, 536 P.2d 717, 720 (1975)). There is a presumption of impartiality by the trial court, *State v. Me-*

*nard,* 135 Ariz. 385, 387, 661 P.2d 649, 651 (App.1983), and a corresponding burden on the party seeking recusal to prove bias or prejudice by a preponderance of the evidence, rule 10.1(c). Further, any provision relating to disqualification of judges must be given strict construction to safeguard the judiciary from frivolous attacks upon its dignity and integrity and to ensure the orderly function of the judicial system. *Rademacher v. City of Phoenix,* 442 F.Supp. 27, 29 (D.Ariz.1977). Also, in addition to demonstrating the court's proclivity, the party seeking recusal must show how that proclivity was prejudicial to him. *See State v. Munoz,* 110 Ariz. 419, 421, 520 P.2d 291, 293 (1974); *State v. La Barre,* 115 Ariz. 444, 448, 565 P.2d 1305, 1309 (App.1977). Finally, the determination of whether to grant a motion for change of judge for cause under rule 10.1 or a motion for new trial lies within the discretion of the trial judge and we will not interfere absent an affirmative showing of abuse of that discretion. *Leslie, supra,* 136 Ariz. at 464, 666 P.2d at 1073; *see Munoz, supra,* 110 Ariz. at 421, 520 P.2d at 293.

█ Appellant agrees that evidence of potential perjury brought to the attention of the court does not necessarily create bias or prejudice by the judge and therefore does not per se require judicial recusal. We further note that in this case, when confronted with the potential perjury problem, the court remained neutral and did not make a judgment about whether appellant actually would testify perjuriously. After informing the court of the possible perjury, appellant's trial counsel requested that he and codefendant Meeker's counsel be allowed to conduct a more active defense than allowed by the ethical standards. Codefendant's counsel reasoned that a more active defense could be permitted because the court already knew about the potential perjury. When codefendant's counsel requested that the jury not be privy to the problem, the court said:

> The jury is as much a part of the Court as I am. You're officers of the Court and to present something that you be-

lieve to be perjured testimony, and I presume that you have reason to believe that it is, to the jury, I think is highly inappropriate and unethical, from what little I understand if, in fact, it's perjured testimony, it's your client's own doing.

And if it be perjury, I don't know, I cannot make that judgment, they are doing it. They put themselves in that position. They are entitled to a fair trial, I am sure they will get a fair trial, but I can't control what it is that they do. Everybody relies on those ABA standards, and they say where defense counsel—where a defendant has admitted certain facts to defense counsel and counsel knows that the facts that the defendant is going to testify to are against those facts, that is a [sic] easy case. That's not the situation we have here, and it's a hard determination for an attorney to make.

I don't know a sufficient amount of facts to make a determination, I think that's something that you'll have to use your own best judgment on.

These are not the words of a judge biased against a defendant.

█ Nevertheless, appellant argues that the subsequent letters from Meeker combined with the perjury problem to prejudice the judge. Appellant cites the A.B.A. Code of Judicial Conduct (17 A.R.S.Sup.Ct. Rules, rule 45) canon 3(A)(4) for the proposition that the judge should not have read Meeker's letters. That canon provides that a judge should "neither initiate nor consider *ex parte* applications concerning a pending or impending proceeding." The judge stated that:

The only reason I read the communications was because of the continuing request for a change of counsel, which I feel has to be ruled upon, if there is a pro per motion for change of counsel. The only way I could ascertain whether or not there was another request being made was to read the correspondence. It doesn't prejudice me in any way whatsoever.

Appellant argues that the judge should have had another person read the letters to determine whether they were in fact *pro per* motions.

Upon reading the trial record, however, we find no indication that the judge became prejudiced after receiving the letters. The very day the judge received the controversial letter he discussed with numerous other judges what he should do. That is a proper action to take. *E.g., Gaston v. Hunter,* 121 Ariz. 33, 59, 588 P.2d 326, 352 (App.1978); canon 3(A)(4). Following the judges' suggestions, the trial judge told all counsel about the letters, discussed the situation with them, gave them copies of the letters, and asked Meeker's counsel to tell Meeker to cease and desist. This case is not one like *Leslie, supra,* in which the trial judge solicited discussions with relatives of the victim before sentencing the defendant, or *State v. Valencia,* 124 Ariz. 139, 602 P.2d 807 (1979), in which the judge discussed the case in his office with a relative of the victim the day before the scheduled resentencing.

█ In addition, in response to the motion for mistrial, the judge stated:

Counsel, as far as the prejudice is concerned, I assure you there is no prejudice as far as I am concerned. I rule on issues of law not issues of fact.

Irrespective of what I may feel personally, one way or the other, I make the legal decisions based on what I believe the law to be and the jury is the one that decides the facts.... There is just no prejudice to me, at least, one way or the other.

We place great reliance on the trial judge's assessment. *See, e.g., State v. Valencia,* 121 Ariz. 191, 194–95, 589 P.2d 434, 437–38 (1979); *State v. Smith,* 111 Ariz. 149, 152, 526 P.2d 392, 395 (1974). Nothing in the trial record demonstrates that the judge was prejudiced against appellant.

█ Appellant's final argument is that there was no opportunity for the judge to manifest his bias at the trial, but that his bias became evident at the sentencing proceeding through the sentences imposed.

After reviewing the presentence report and the transcript of the sentencing hearing, however, we cannot agree that the sentences imposed establish bias by the sentencing judge.

The record reflects appellant's history of criminal activity, including two 1978 judgments of conviction in Arizona for armed robbery. Appellant had been out of prison for those robberies only a month, and was still on parole, when he committed the robberies at issue in the present case. During the instant robberies, appellant wielded a sawed-off shotgun and struck one of the victims. The probation officer, in his presentence report, noting the increasing frequency and severity of appellant's criminal activity, concluded that "[i]f ever allowed to return to the community, it is highly probable that the defendant will again engage in these types of offenses and a more serious consequence may result." At the sentencing hearing much aggravating evidence was presented, but no mitigating evidence. Considering this fact plus the aggravating evidence reviewed above, the imposition of harsh sentences does not establish bias or prejudice.

The trial judge did not abuse his discretion in not recusing himself.

## III. IDENTIFICATION ISSUE

Appellant argues that in-court identifications by three of the victims, Gronek, Thompson, and Pell, were products of unduly suggestive actions by the police and the prosecutor, and that all in-court identifications and all evidence of pretrial identifications by these victims, therefore, should have been suppressed. The actions of which appellant complains are: identifications by the three victims at the arrest site; viewings of appellant by the three victims when they were sworn in to testify; viewings of appellant by Thompson and Pell at a motion to continue; and two occasions in which photographs of the suspects were shown to Pell. After a hearing pursuant to *State v. Dessureault,* 104 Ariz. 380, 453 P.2d 951 (1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970), the

trial court found that the pretrial procedures were not unduly suggestive and admitted the in-court identifications and evidence of the complained-of pretrial identifications.

Every accused has a due process right to a fair identification procedure. *State v. McCall,* 139 Ariz. 147, 154, 677 P.2d 920, 927 (1983). The key in determining fairness is "whether, in light of the totality of the circumstances, the pretrial 'identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Burnette,* 698 F.2d 1038, 1045 (9th Cir.1983) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). "Thus, even unnecessarily suggestive pretrial procedures do 'not violate due process so long as the identification possesses sufficient aspects of reliability.'" *Burnette, supra,* 698 F.2d at 1045 (quoting *Manson v. Brathwaite,* 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977)). Factors to be considered in this determination of reliability include "[t]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation." *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *McCall, supra.* Finally, absent clear and manifest error, we will not reverse a conviction because of a trial court's admission of identification evidence. *See State v. Schilleman,* 125 Ariz. 294, 297, 609 P.2d 564, 567 (1980).

Appellant asserts that the suggestiveness of the pretrial procedures concerning Gronek, Thompson, and Pell is shown by, *inter alia,* the fact that none of the other victims was able positively to identify the robbers. From this fact appellant argues that Gronek, Thompson, and Pell, like the other victims, would not have been able to identify the robbers from viewing them at

the robbery, but were able to make positive identifications only because of the suggestiveness of the showups at the arrest site and subsequent events.

In this argument appellant ignores several important facts. First, only Pell identified all three men involved in the robbery; Thompson identified only appellant and co-defendant Meeker, and Gronek identified only appellant. Thus, the complained-of procedures certainly were not so suggestive as to ensure identification. Second, other victims were able to pick out photos of the robbers from photo lineups. Joseph Farringa (a victim of the third robbery along with Pell) accurately described appellant and then, although not positively, picked out a photo of appellant from a photo lineup containing five photos depicting individuals who look similar to appellant. Farringa did the same regarding co-defendant Meeker. Similarly, Anthony Karbaj (a victim of the first robbery) picked out Meeker from a five-photo lineup, although like Farringa, not positively. Thus, other victims were able to identify photos of the robbers. Third, several of the victims accurately described appellant. Fourth, some of the victims testified they did not see appellant because he went to the other side of the car they were in. Fifth, Al Bonaguidi (a victim of the first robbery) is legally blind. Sixth, Nancy Richardson (a victim of the third robbery) was crying during at least part of the incident. Thus, at least one victim did not pay close attention to the robbers' characteristics because she was terrified at being robbed.

 From these considerations we conclude that although not all of the victims were able to identify appellant, to pick his photo out of a photo lineup, or to describe him, close analysis reveals that some of the victims did identify him, did pick his photo out of a photo lineup, and did describe him. Further, some of the victims did not see him because they were on the other side of the car, or could not see him because of a physical limitation, or did not pay close attention because of being upset at being

robbed. So many factors can affect why some victims can identify a defendant and why some cannot that we decline to make a conclusion from the mere fact that in this case some victims could identify appellant and some could not. Rather, we prefer to analyze each of the complained-of-victim's testimony individually.

 Appellant complains about two specific pretrial incidents involving Gronek; the first is an identification at the arrest-site showup and the second is a viewing of appellant when Gronek was sworn in to testify. Appellant contends that evidence of the identification at the arrest site should have been suppressed, and that both pretrial viewings tainted the in-court identification such that it should not have been admitted.

The identification at the arrest site took place shortly after officers stopped the suspects' car and within about 30 minutes of the robbery. Upon seeing the police stop the suspects' vehicle, Gronek and Thompson stopped their car about a block away from the scene. After the suspects were secured, an officer brought Gronek to the arrest site. The three suspects were sitting in the back seats of three different police cars. Gronek was brought to each car, and an officer shined a flashlight beam on each suspect's face and asked whether Gronek could identify anyone. During this time, Thompson was not within sight or hearing range of Gronek. Gronek identified appellant, but could not identify Meeker or Reed.

We agree with the state that these actions by the officers should be commended, not condemned. Identification procedures commenced soon after a crime can be beneficial in at least three ways: identification accuracy is fostered because an image of the culprit is still fresh in the victim's mind; innocent persons can be released immediately; and the police can be immediately freed to resume their search for the suspect while the trail is still fresh. *See State v. Gastelo,* 111 Ariz. 459, 461, 532 P.2d 521, 523 (1975). All these benefits were possible in the present case. Further, the police

acted prudently in keeping Thompson out of sight and hearing range of Gronek when Gronek was viewing the suspects. This negated any possibility that Gronek would be influenced by a fellow victim. *See State v. Skelton,* 129 Ariz. 181, 183, 629 P.2d 1017, 1019 (App.1981).

Nevertheless, the very nature of the procedure used, a showup, is to some extent suggestive. We therefore examine the arrest site identification under the *Neil v. Biggers* reliability analysis set forth above. Gronek saw appellant three times before the showup. Gronek first saw appellant at the river party. The next time was during the robbery, where appellant, holding a shotgun across Gronek's throat, was only inches away. The third time was at the Circle K, where Gronek was able to observe appellant for a couple of minutes under good lighting conditions. With regard to Gronek's attentiveness, Gronek testified that although he did not look at appellant during much of the robbery, he (Gronek) saw appellant enough to have a good recollection of him. The third *Neil v. Biggers* criterion is the accuracy of the witness' prior description of the criminal. Gronek testified that before viewing appellant at the arrest site he gave what amounted to a brief but accurate description of appellant. Gronek's trial testimony does not indicate the level of certainty he possessed when identifying appellant at the arrest-site confrontation. Nevertheless, an officer present at that confrontation described Gronek's identification as "positive." Finally, only about 30 minutes elapsed between the robbery and the showup. Thus, the image of appellant was still fresh in Gronek's mind. All of these factors indicate the arrest-site identification was reliable.

Also demonstrating that the showup identification was reliable and not the product of any suggestiveness at the arrest site is that Gronek identified only one of the three suspects subjected to the showup. Thus, the complained-of procedure was certainly not so suggestive as to ensure identification. *See Skelton, supra,* 129 Ariz. at 183, 629 P.2d at 1019. Further, the only

suspect Gronek identified, appellant, was the one who went to Gronek's side of the car and the one, therefore, who Gronek had a good opportunity to view during the robbery. We conclude that the trial court correctly admitted evidence of the identification at the arrest site.

In addition to the evidence concerning the identification at the arrest site, appellant complains that Gronek's in-court identification should not have been admitted because it was tainted by the arrest-site showup and by a viewing of appellant by Gronek when he was sworn in to testify. Having already concluded that evidence of Gronek's arrest-site identification was properly admitted, the remaining question for us to determine is whether any suggestiveness present at that identification combined with any suggestiveness present when Gronek was sworn as a witness rendered Gronek's in-court identification unreliable.

After the arrest, the next time Gronek saw appellant was the day before Gronek testified, when he was sworn as a witness. At trial Gronek testified that when he entered the courtroom to be sworn he saw appellant and immediately recognized him as the robber. Gronek left the courtroom as soon as he was sworn in. The process lasted between five and ten minutes.

After reviewing the record, we conclude that the viewing at the arrest site and the viewing when Gronek was sworn to testify were not " 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' " at trial. *Burnette, supra,* 698 F.2d at 1045 (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). The arrest site identification was reliable. Further, the confrontation when Gronek was sworn to testify was brief, and Gronek testified that he recognized appellant immediately. Also, under the *Neil v. Biggers* criteria, the identification was reliable: Gronek had good opportunities to view appellant before the arrest; Gronek was attentive during the crime; he

accurately, albeit briefly, described appellant; and at trial, Gronek testified he was certain appellant was the culprit, and was adamant that his in-court identification was based on the robbery itself and not on the questioned pretrial procedures. Finally, Gronek had already positively identified appellant at the arrest-site showup. Thus, this is not a case like *State v. Strickland,* 113 Ariz. 445, 556 P.2d 320 (1976), in which the victim failed on three occasions to identify the defendant and then finally identified him after viewing him at a preliminary hearing. Gronek's in-court identification was reliable.

Our conclusion is unaltered by Gronek's acknowledgment, after pressing cross-examination, that the complained-of viewings might have helped him identify appellant in court at trial. In *Dessureault, supra,* 104 Ariz. at 384–85, 453 P.2d at 955–56, we recognized that "[t]his reinforcement of the witness' original identification, honestly admitted, is inherent in every case and we know of no means by which it can be avoided. Unless virtually all eye witness testimony on identification is to be outlawed, the ultimate determination must be whether the in-court identification is or can be made independent of other pretrial identification procedures." In the present case, after Gronek made this acknowledgment, he clearly indicated that his in-court identification was, contrary to appellant's attorney's leading assertion, based more on the viewing at the robbery itself than on the complained-of viewings. As described above, Gronek's conclusion is supported by the record. We find no error regarding Gronek's testimony.

In addition to the identifications by Gronek, appellant claims that identifications by Timothy Thompson were also improperly admitted. Appellant identifies three specific pretrial incidents involving Thompson; two of these are the same incidents to which appellant objected concerning Gronek's testimony (an identification at the arrest site and a viewing when Thompson was sworn as a witness); and the third is a viewing of appellant by Thompson at a motion to continue. Appellant contends

that evidence of the identification at the arrest site should have been suppressed, and that all three pretrial viewings tainted the in-court identification such that it should not have been admitted. We disagree.

The showup before Thompson at the arrest site was conducted almost identically to the showup before Gronek. The suspects were sitting in the back seats of three different police cars, Thompson was brought to each car, and an officer shined a flashlight beam on each suspect and asked whether Thompson could identify anyone. During this time, Gronek was not within sight or hearing range of Thompson. Thompson identified appellant and Meeker, but could not identify Reed.

After reviewing the record, we conclude that Thompson's arrest-site identification of appellant was reliable and therefore properly admitted. Like Gronek, Thompson saw appellant three times before the showup. The first time was at the river party. The second time was at the robbery, which Thompson testified lasted about ten minutes. Thompson identified codefendant Meeker as the one who went to the driver's side of the victims' car and put a handgun to his (Thompson's) head. Thompson identified appellant as the one who went to the passenger's side of the car and dealt with Gronek. The third time Thompson saw appellant was at the Circle K. During the robbery, Thompson was attentive: he testified that he made an effort to observe the assailants and to remember them as well as he could. Additionally, Thompson testified that when he saw appellant at the arrest site, there was no doubt appellant was one of the robbers. Further, only about 30 minutes elapsed between the robbery and the showup; thus, the image of appellant was still fresh in Thompson's mind. Finally, Thompson identified only two of the three suspects subjected to the lineup. Hence, the complained-of procedure was certainly not so suggestive as to ensure identification. *See Skelton supra.* Thompson's identification of appellant at the arrest-site showup was

reliable and therefore evidence of it was properly admitted at trial.

■ The next contention is that Thompson's in-court identification of appellant should not have been admitted because it was tainted by three pretrial viewings. In addition to the arrest-site showup, Thompson saw appellant when sworn as a witness and at a court proceeding about three weeks before trial. The circumstances surrounding Thompson's viewing when he was sworn as a witness were virtually identical to those surrounding Gronek's viewing when he was sworn. With regard to the court proceeding three weeks before trial, appellant had been subpoenaed to appear in court that day so he could testify at the *Dessureault* hearing. For various reasons, however, the hearing was continued. During the proceeding regarding the continuance, Thompson sat in the back of the courtroom and saw appellant sitting near his attorney.

We conclude that the in-court identification was reliable. Thompson had good opportunities to view appellant before the arrest and was attentive during the robbery. Also, Thompson testified that at the proceeding regarding the continuance he instantly recognized appellant and was positive appellant was one of the assailants even though appellant had shaved his beard and cut his hair since the robbery. Further, when Thompson was sworn as a witness, he again immediately recognized appellant. Finally, Thompson had already identified appellant at the arrest-site showup. *See Strickland supra.* Thompson's in-court identification was reliable and therefore properly admitted.

In addition to the identifications by Gronek and Thompson, appellant contends that identifications by Barbara Pell also should not have been admitted. Appellant specifies five pretrial incidents involving Pell; three of these are the same incidents to which appellant objected concerning Thompson's testimony (an identification at the arrest site, a viewing when Pell was sworn as a witness, and a viewing at the proceeding regarding the continuance), and the fourth and fifth involve two occasions in which photographs of the suspects were shown to Pell. Appellant contends that evidence of the arrest-site identification and evidence of the photo showup identifications should have been suppressed, and that the five pretrial incidents combined to taint the in-court identification such that it should not have been admitted.

When Pell and the officers accompanying her saw the arrest site they stopped about a block away. After the suspects were secured, an officer brought Pell to the arrest site. The three suspects, having just been taken out of three different police cars (apparently after Gronek and Thompson finished their viewings), were standing next to the three cars. Pell was brought within about 15 feet of each suspect and asked whether she had seen him before. During this time, neither Gronek nor Thompson was within sight or hearing range of Pell. Pell identified all three suspects.

■ We agree with the trial court's decision to admit evidence of Pell's arrest-site identification of appellant. Pell saw appellant twice before the showup—at the robbery, which lasted about five minutes, and at the Circle K, where Pell viewed the assailants under good lighting for about two minutes. Pell's attentiveness is demonstrated by the facts that she could describe all three assailants and the place each was sitting in the robbery car, and that she remembered the license plate number of the robbery car. Pell was sure the suspects were the assailants. Finally, the identification took place within one-half hour of the crime. The arrest-site identification was reliable and therefore properly admitted.

■ Appellant also contends that it was error to admit evidence that Pell recognized appellant's photo in two photo showups. The first showup occurred about a month after the robbery. The reason for the showup was to alleviate some confusion in the police reports as to which names were associated with which suspects, the

role of each suspect in the crime, and the location of each suspect in the robbery vehicle. A photo showup instead of a photo lineup was used because Pell had already positively identified the suspects at the arrest site. At the showup, two officers showed three pictures to Pell, each picture depicting one of the robbers. Pell immediately pointed to appellant and said she would never forget his eyes. The second showup occurred about three months after the robbery. Shortly before defense attorneys interviewed Pell, the prosecutor showed her the same three photos she was shown before and asked her whether she recognized any of the men depicted in them.

Again, Pell's identifications were reliable. Pell had good opportunities to view appellant before the arrest and was attentive during the robbery. Also, when shown the photos, Pell immediately recognized the assailants and stated that she would never forget appellant's eyes. *See Neil v. Biggers, supra,* 409 U.S. at 201, 93 S.Ct. at 383 (victim testified there was something about defendant's face "I don't think I could ever forget."). Finally, Pell had already positively identified appellant at the arrest site. *See Strickland, supra.* Evidence of Pell's identification of appellant from the photo showup was reliable and therefore admissible.

■ The final contention is that Pell's in-court identification of appellant should not have been admitted because it was tainted by pretrial viewings. In addition to viewings at the arrest-site showup and the photo showups, Pell, like Thompson, saw appellant when she was sworn as a witness and at a court proceeding about three weeks before trial. The circumstances surrounding Pell's viewing when she was sworn as a witness were similar to those surrounding Thompson's and Gronek's viewings when they were sworn. Similarly, the circumstances surrounding the viewing at the court proceeding were virtually identical to those surrounding Thompson's viewing at that proceeding.

We conclude that Pell's in-court identification was reliable. Pell had good opportunities to view appellant before the arrest and was attentive during the robbery. Also, when shown the photographs, Pell recognized appellant immediately and said she would never forget appellant's eyes. Similarly, at the proceeding regarding the continuance, Pell recognized appellant immediately, even though appellant had changed his appearance by shaving his beard and cutting his hair since the robbery, and said that appellant's eyes were his most outstanding feature. Further, when Pell was sworn as a witness she again immediately recognized appellant. Finally, Pell had already identified appellant at the arrest-site showup. *See Strickland, supra.* Pell's in-court identification was reliable and therefore properly admitted.

## IV. RULE EXCLUDING WITNESSES

Appellant argues that the trial court erred when it denied appellant's motions to strike Thompson's testimony and preclude Gronek from testifying because of a violation of the rule excluding prospective witnesses from the courtroom and prohibiting them from communicating with each other until all have testified. 17 A.R.S. Rules of Criminal Procedure, rule 9.3(a). The rule was invoked the morning opening statements were given. That afternoon Thompson and Gronek were sworn and Thompson began his testimony. During Thompson's testimony it became apparent that during a recess just before Thompson and Gronek were sworn, the two had been in the courtroom talking with the prosecutor in each other's presence.

■ Upon disclosure of this evidence, the court ordered a recess, conducted a hearing, and then denied the motions. During the hearing, the prosecutor first argued that the rule did not apply to Thompson and Gronek because they had not yet been sworn when the questioned discussion took place. The trial court was astonished at the prosecutor's belief and so

are we. The rule in no way limits itself only to sworn witnesses. *See* rule 9.3(a).

The state now concedes that rule 9.3(a) was violated, but argues that reversal is not required because the violation was not wilful and appellant was not prejudiced. We agree with the state that rule 9.3(a) was violated but that reversal is not required.

In *State v. Schlaefli*, 117 Ariz. 1, 3–4, 570 P.2d 772, 774–75 (1977), we said:

> We repeat: mere violation of a rule does not result in automatic reversal. We have specifically said,
>
> > "[t]he violation of the order of exclusion does not in itself make the witness incompetent to testify." *State v. Sowards*, 99 Ariz. 22, 26, 406 P.2d 202, 204 (1965).
>
> We indicated in that opinion that the admission of testimony after a witness has violated the rule is a matter of discretion with the trial judge. Absent an abuse of that discretion and subsequent prejudice to the defendant, we will not reverse on appeal. *State v. Sowards, supra.*

Petitioner argues that our decision in *State v. Roberts*, 126 Ariz. 92, 612 P.2d 1055 (1980), alters *Schlaefli*, establishing that when a witness violates the rule, prejudice is presumed. Petitioner's interpretation of *Roberts* is incorrect. In that case we said that under rule 9.3(a) (providing that upon the request of a party the court "shall" exclude prospective witnesses) "failure [by the court] to honor an exclusionary request is presumed prejudicial unless the absence of prejudice is clearly manifest from the record." *Roberts, supra*, 126 Ariz. at 94, 612 P.2d at 1057. *Roberts*, by its own terms, concerns the situation in which a court refuses a party's request to invoke the rule, and not the situation in which the rule is invoked and then violated by a witness. The latter situation is governed not by *Roberts*, but by cases such as *Schlaefli, supra*, and *State v. Hadd*, 127 Ariz. 270, 619 P.2d 1047 (App.1980). *See also United States v. Ell*, 718 F.2d 291, 293 (9th Cir. 1983) (cases where the court improperly refuses to order the exclusion of witnesses at a defendant's request are "not controlled by those Ninth Circuit cases that consider the appropriate remedy when a witness violates an exclusionary rule order ...."). Thus, in this case we will not interfere with the trial court's decision denying appellant's motions absent an abuse of discretion and evidence of prejudice to appellant's case.

During the hearing, both prosecution and defense counsel questioned Thompson; neither side called Gronek. Defense counsel established that in Gronek's presence Thompson discussed with the prosecutor the date and time of the incident. Also in Gronek's presence, the prosecutor showed Thompson pictures of the crime scene, the suspects' car, and Thompson himself shortly after the suspects were apprehended. The prosecutor asked Thompson if he recognized the car. Finally, Thompson heard the prosecutor ask Gronek if he recognized anyone in the courtroom.

In response to the facts established by defense counsel, the prosecutor established that he and Thompson did not in Gronek's presence discuss the events of the night of the robbery in any more detail than the date and time of the incident. Second, Thompson had previously identified the photos shown to him in Gronek's presence, and there is no evidence that Gronek saw the pictures shown to Thompson. Also, in response to the prosecutor's question about whether Thompson recognized the car in one of the photos, Thompson merely said "yes." Finally, the prosecutor and Gronek were walking away from Thompson when the prosecutor asked Gronek if he recognized anyone, and all Thompson heard Gronek say was "yes."

The trial court, with this evidence in mind, found that the prosecutor did not discuss the case with Thompson and Gronek so their stories could "gel," and allowed both victims to testify. The facts reveal that significant information was not shared during the conversation in question.

We find no abuse of discretion by the trial court.

## V. ASSISTANCE OF COUNSEL AT SENTENCING

Appellant claims that at sentencing he was denied the effective assistance of counsel. "The duty of defense counsel in representing his client does not terminate with a determination of guilt, but extends to the sentencing stage." *State v. Carriger,* 132 Ariz. 301, 303, 645 P.2d 816, 818 (1982); 17 A.R.S. Ariz.R.Crim.Pro., rule 6.3(b). The standard for determining whether representation is sufficient is "whether under the circumstances the attorney showed at least minimal competence in representing the criminal defendant." *State v. Watson,* 134 Ariz. 1, 4, 653 P.2d 351, 354 (1982). We have said that minimal competence at the sentencing stage requires the attorney at least "to challenge the admission of aggravating evidence where reasonably possible and to present available mitigating evidence," *Carriger, supra,* 132 Ariz. at 304, 645 P.2d at 819, and that " 'when counsel's acts and omissions reduce his role to one approaching that of a neutral observer, a defendant is denied the effective assistance of counsel.' " *Id.* (quoting *State v. Myles,* 389 So.2d 12, 31 (La.1979)).

At the sentencing proceeding, appellant was not represented by his trial counsel, but instead by substitute counsel. When the court asked substitute counsel whether he had anything to say or any legal cause to show why judgment and sentence should not be pronounced, counsel said:

> Since I am just substituting for Mr. Burdick [trial counsel] today, I am not familiar enough with the case to make a statement, so I have nothing further.

The state then set forth aggravating factors. When the state finished, substitute defense counsel said:

> Your Honor, for the record, I did read the presentence report. I am not familiar enough with the case to be able to tell whether there was anything there that was inaccurate. I did not see anything

that I would be able to say was inaccurate, so I have nothing further.

The trial court then sentenced appellant to three consecutive terms of life imprisonment and stated that its reasons for imposing consecutive sentences were that appellant was on parole when he committed the instant offenses (A.R.S. § 13–604.01), and that appellant was a danger to society.

These facts lead us to conclude that at sentencing appellant was denied the effective assistance of counsel. Counsel's role was no more significant than that of a neutral observer. Counsel made no attempt to present any mitigating evidence. In fact, counsel's only statements at sentencing were those quoted above. Appellant was not given minimally competent representation at sentencing.

## VI. PROPRIETY OF SENTENCE IMPOSED

Because of our disposition of the claim concerning the assistance of counsel at sentencing, this claim has become moot.

The judgments of conviction are affirmed. The sentences are set aside and the case is remanded to the trial court for resentencing.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.